(No. 21079

WALTER PORTER, Appellant, *vs.* CLARENCE P. GREENING,
Appellee.

*Opinion filed February 19, 1932.*

W. J. REARDON, ROBERT H. ALLISON, and WILLIAM A.
POTTS, for appellant.

ALFRED H. GREENING, and STONE, McLAREN & WEBB,
(L. E. STONE, of counsel,) for appellee.

Mr. JUSTICE HEARD delivered the opinion of the court:

At the township election of the town of Mackinaw
held on the seventh day of April, 1931, appellant, Walter
Porter, and appellee, Clarence P. Greening, were candidates

for supervisor. The township of Mackinaw is divided into two election districts or precincts—No. 1 and No. 2. Upon a canvass of the returns from the two election precincts the canvassing board found and reported that appellant had received 364 votes for the office of supervisor and that appellee had received 377 votes, and appellee was declared elected to the office. A petition of appellant to contest the election was filed May 6, 1931, in the county court of Tazewell county, making the usual allegations of illegal voting, improper counting and canvassing of the ballots, making a *prima facie* case for the re-counting of the ballots and alleging that upon such re-count appellant would be shown to have been elected. Appellee filed his answer to the petition, evidence was heard, a re-count of the ballots had, and the court entered an order finding "that the evidence fails to show that the ballots offered in evidence in this cause were, prior to the time they were impounded in this court, so kept and protected as that they are the best evidence in this cause, and that by reason thereof the court further finds that the returns made by the said judges and clerks of election in said township are the best evidence of the result of said election and should stand as the true result of said election," and adjudging that appellee was duly elected supervisor of the township of Mackinaw. From that judgment appellant has appealed to this court.

The voting place in precinct No. 2 was in the building known as the Woodmen Hall, and the judges of election in that precinct were Charles Tyrrell, Jacob Steiner and Fred Whisler. After the polls were closed in the precinct the ballots were counted, tallied, piled in one pile and wrapped with a light wire, the ends of which were hooked or fastened together but not sealed. They were then placed in a sack fifteen inches wide and twenty-five and three-fourths inches long. The sack was then sealed and it and its contents were taken to the room of the town clerk by Charles Tyrrell, one of the judges of the precinct, who

locked them in the town clerk's office. Tyrrell had procured the key to the town clerk's room from the town clerk that evening when they started to count the votes and kept the key until the next morning. He placed the ballots on a table in the town clerk's room over against the east wall of the room, opposite the door to the office. About seven o'clock the next morning he returned the key to the town clerk and advised him that he had placed the ballots in his office. The town clerk put the sack from precinct No. 2 in the safe and left the poll-books with the poll-books of precinct No. 1.

The town clerk's office is a room about ten or twelve feet square, in the northeast corner of the building known as the Woodmen Hall. The entrance to the hall is by an outside door through a hallway, or vestibule as it is called in the record, which leads to the lodge room proper. The town clerk's office is entered through a door leading from the vestibule. The polling place in precinct No. 2 was in the lodge room in the Woodmen Hall just back of the town clerk's office and was entered through the vestibule leading from the front door. The Woodmen Hall fronts on the main street running east and west through Mackinaw. In the front of the town clerk's office there is a large stationary window about five feet square, from which the interior of the town clerk's office can be seen. There is also a window on the east wall of the building, which is the east wall of the town clerk's room. The town clerk's office is also equipped with a window on the west or vestibule side, about fifteen inches wide and twenty-one inches high. This window is opened by sliding upward and is fastened on the inside of the town clerk's room by a hook. About once a week the lodge room is used as a moving picture show room, and on those occasions the tickets to the show are sold from this window, referred to as the "ticket window." Parties entering the show enter the building at the front door west of the town clerk's room

and pass through the vestibule by the ticket window, where the tickets are sold. There is another window near the southwest corner of the town clerk's office about eighteen inches wide and thirty-four inches high, through which the moving picture shows may also be observed by the person selling tickets.

The safe where the ballots were placed was in the southwest corner of the town clerk's office, in plain and direct view of persons in the street or on the sidewalk in front of the Woodmen Hall, through the large window in the front of the office. The sacks containing the ballots were provided, with supplies, by the county clerk to the various townships for election purposes. These sacks are closed except at one end, which is open clear across the sack, with a draw-cord around the entire open end, and the sack is closed by drawing that cord. It is practically impossible to entirely close the sack by drawing the cord. Upon an examination of the sacks in the presence of the court it was revealed that the sack containing the ballots from precinct No. 1 was closed by drawing the cord and then wrapping the draw-cord around the top of the sack below the end and tying the cord and sealing the knot with wax. Sack No. 2 was closed by drawing the cord and tying it and sealing the knot with wax. It was closed by the drawstring, only, while sack No. 1 had been drawn and then the string tied around the neck of the sack. The seal on the knot of the opening in the sack containing the ballots of precinct No. 2 does not entirely close the opening of the sack but leaves an open space at the mouth of the sack, which is now about two inches in diameter. The sacks were opened in court by cutting across the bottom of the sack, the seal at the mouth of the sack remaining undisturbed. The ballots contained in the sack were eight and three-eighths inches long by six and one-half inches wide. They were not folded, and when placed on top of each other made a pile one and three-fourths inches high. The circle at the

head of the column in which appellant's name appeared as a candidate was one and one-eighth inches from the top and one and one-sixth inches from the side of the ballot. The center of the square opposite appellant's name was two and one-half inches from the top and one and one-fourth inches from the side of the ballot.

The important question in this case is whether the ballots or the returns of the election officials should prevail. Where the ballots have been preserved in such a way that it clearly appears that they are in the same condition as when counted they constitute the best evidence of the result of an election. Even though they have not been strung, sealed and kept in the precise manner directed by the statute the disregard of the statutory provisions is not conclusive against their weight as evidence, but the burden rests upon the contestant to show that the ballots are those cast at the election and that they are in the same condition as when cast. Unless their preservation is shown to have been such that there has been no reasonable opportunity for tampering with them they cannot overcome the returns. *Rottner* v. *Buchner,* 260 Ill. 475; *Graham* v. *Peters,* 248 id. 50; *Jackson* v. *Winans,* 287 id. 382.

As to the condition of the sack containing the ballots of precinct No. 2 at the time of the trial, with reference to its condition at the time it was placed in the town clerk's office, Charles Tyrrell, one of the judges of the election, testified "that sack was in the same condition when it was placed there as it is now, so far as I know." T. L. Haensel, the town clerk, testified that he placed the ballots in the safe in his office on the eighth day of April (the day following the election) and delivered them to the county clerk of Tazewell county about May 8, 1931; that "looking at those sacks as they now are, so far as I know they are as I saw them on April 8. I think they are the same. * * * Those packages or sacks were in the same condition when I delivered them to the county clerk as they were when

I received them from the election judges. I did not make any special examination of what articles were brought back to me. I don't remember of the sack you are calling my attention to, similar to the sack in precinct No. 2, being open when I received it. I think that if it had been open I probably would have noticed it." Fred Whisler, one of the judges of the election in precinct No. 2, testified that "Mr. Steiner and myself sealed the sack that contained the ballots. We did the physical act of closing the sack and sealing it. To the best of my knowledge I would say the mouth and seal of that sack wasn't in the same condition as it was when Mr. Tyrrell took it away." Jacob Steiner, one of the judges of election in precinct No. 2, testified that "after counting the ballots that evening we placed them in the sack—in the bag—tied the sack and sealed it, and it was given to Mr. Tyrrell. By opening the sack as you are now doing I can see paper in the bottom of the sack. After the examination of the sack at the mouth and near the seal it appears larger than it was when I sealed it that night and delivered it to Mr. Tyrrell. The opening is about two inches. I don't remember if there was any opening there that we left. That night Mr. Whisler and I didn't put our fingers in the folds and try to stretch them out. In other words, we pulled the cords up and tied them, and I don't recall having looked into the sack or the end of the sack." Emma Whisler, a clerk of election in precinct No. 2, testified that she saw the sack tied, and that the opening was not there when she saw them tie the sack. When asked, "Is that sack in the same condition as when they were tying it?" she answered, "It was drawn tighter than that." Udocia B. Payne, a deputy county clerk, testified that Haensel, the town clerk, delivered the sacks to her; that she put them in the case in the back room, locked them up and kept the key; that she afterwards gave the key to the county clerk; that the sacks were in the same condi-

tion at the time of the trial that they were when delivered to her. The county clerk testified that after Miss Payne gave him the key the ballots were locked up in a case at all times except on one occasion when the case was opened and the sacks shown to appellee's attorney. Haensel, the town clerk, testified to locking the office at all times when he left it; that "I put in possibly thirty minutes a month in my office, and from the time I received those ballots until I brought them to Pekin I was not in the office very much;" that "Mr. Ahrendt carries a key to the office. If there are any other keys I don't know of them. Mr. Ahrendt was my predecessor. I do not know that anyone else had access to that room except Mr. Ahrendt and myself. It is possible but not probable." George Ahrendt, the village marshal, testified that he was the ticket seller for the moving picture show; that he had a key to the town clerk's office and was in the town clerk's office to sell tickets four times between April 7 and May 8; that he did not see the ballot bags at any time; that during the time he was in there no one molested the ballots; that "I have a key to that office and there are other keys around town that I know of, and it is possible for any man having a key to the office to enter the town clerk's room."

Ten of the ballots which contained a cross in the square in front of appellant's name and a cross in the square of the opposite party were pointed out to the court upon the trial and the claim is made that these ballots had been tampered with after they were cast. It is contended that these ballots show upon their face that the markings in the party circle and the markings in the square in front of appellant's name were made by different persons and with different pencils, and that there is a dissimilarity in the shape of the crosses in the party circle and those in front of appellant's name. These ballots have been certified to us separately from the other ballots and exhibits, which were all ordered certified to us by the clerk.

In an election contest, unless the evidence shows that the ballots have been preserved in such a way that there was no reasonable opportunity for tampering with them they cannot overcome the returns of the judges and clerks of election. Although a proceeding to contest an election is a statutory proceeding, the finding of the trial court will not be disturbed on appeal unless it is palpably against the weight of the evidence. (*Jackson* v. *Winans, supra; Rottner* v. *Buchner, supra.*) The court saw and heard the witnesses, viewed the sack and the opening at its mouth and the possibility of making additional markings upon the ballots without withdrawing the ballots or breaking the seal, and we cannot say from the evidence that the court's finding as to the preservation of the ballots was palpably against the manifest weight of the evidence.

Questions are raised as to the non-residence of some of the persons voting, as to whether some ballots counted should be excluded and some excluded counted. If all these questions were decided in appellant's favor the result would remain unchanged.

It is claimed by appellant that the election returns in precinct No. 2 should not have been received in evidence, as the poll-books do not show that the judges and clerks of election were sworn before entering upon the discharge of their duties. The poll-books show that each one of the officers subscribed the oath but there is no signature to the jurat. The evidence shows that each of the officers was, in fact, sworn. In *People* v. *Hilliard,* 29 Ill. 413, where a similar question arose, it was said: "The objection that the entry of the oaths of the judges and clerks of the election was not prefixed to the poll-books, as required by section 13 of chapter 37, is of no force, for such entry forms no part of the certificate on which the board is to act. The certificate itself was formal and regular. But we think it was wholly immaterial, so far as the validity of the return was concerned, whether the officers of this

election precinct were sworn or not. They were acting *colore officii* in the performance of appropriate acts and are presumed to have been well appointed and qualified. In the case of *People* v. *Cook,* 14 Barb. 259, it was said, if inspectors of elections come into office by color of title that is sufficient to constitute them officers *de facto,* and if they· are officers *de facto* their omission to take the oath prescribed by the statute will not invalidate an election held by them." See, also, *Ackerman* v. *Haenck,* 147. Ill. 514. In a contested election case the burden rests upon the contestant to show that the contestee was not legally elected to the office in question.

We do not feel that in this case we would be justified in setting aside the judgment and order of the county court, and they are therefore affirmed. *Judgment affirmed.*