13 P.(2d) 877

## MADRID v. SANDOVAL.

No. 3717.

Supreme Court of New Mexico.

Aug. 22, 1932.

See, also, 35 N. M. 252, 294 P. 631.

C. N. Higgins, of Las Vegas, and David Chavez, Jr., and William A. Gillenwater, both of Santa Fé, for appellant.

David J. Leahy, of Las Vegas, for appellee.

SADLER, J.

At the general election held November 4, 1930, Alfonzo Sandoval, appellant herein, and Levi Madrid, appellee, were rival candidates for the office of county superintendent of schools in Mora county. Upon the face of the returns, appellee received a total of 1,976 votes and the appellant 1,938. Appellee having a majority of 38 votes was awarded the certificate of election. Thereafter, and within the time prescribed by statute, the appellant filed his petition for a recount of the ballots in precincts 1, 2, 4, 9, 12, 15, and 22, being seven of the twenty-five precincts in the county. The election officials were duly assembled as provided by law, and as a result of the recount of the precincts named, which incidentally by the original canvass returned a combined vote of 923 for each of the opposing candidates, the appellant was shown to have a total of 966 votes in said precincts and appellee a total vote of 876. The appellee's majority at the original canvass having thus been overcome, the county canvassing board revoked the certificate theretofore issued, awarded a new one to appellant and the latter entered immediately upon the duties of the office.

Thereafter and seasonably the appellee instituted this contest to try the right to the

office in question, alleging, among other things, that in each of the precincts recounted some of the ballots had been changed, mutilated, and marked between the date of the original count and the recount, towit, between November 10, 1930, and January 2, 1931, so as to show the result attained at the recount, upon which allegations the appellant joined issue. Other grounds of contest were set up which will be adverted to hereinafter.

Upon the trial of the main issue of change and alteration of ballots between the dates of the two counts voluminous testimony was taken. Largely it consisted of a recital by the judges and clerks of election, and. counting judges and counting clerks in precincts where the latter officiated, of the manner of conducting the two counts, of the care exercised to avoid mistakes in the original count, and likewise in the recount, and an affirmance by these officials, or most of them, of the correctness of their original count as the ballots then appeared. This was without exception followed by an affirmance on the part of the same witnesses of the correctness of their tabulations at the recount as the ballots appeared on such occasion.

So much for the testimony of the witnesses of the parties tending to furnish verity and authenticity to the two counts. Supporting the allegations of fraudulent alteration and ·change of ballots during the time intervening between the two counts, appellee's proof partook of two kinds: First, evidence of a general nature tending to show opportunity for tampering through careless and lax manner of preserving the ballots in the interim between the counts; and, next, circumstances tending to furnish proof of improper access to the boxes of certain precincts.

At the conclusion of the trial appellee interposed a motion for judgment consisting of several grounds. The motion was sustained by the trial court, which thereupon made its findings of fact and conclusions of law. Among other things the court found that certain of the ballots in each of the precincts recounted had been fraudulently altered and changed between the dates of the two counts so as to accomplish the result reflected by the recount; that the ballot boxes from each of said precincts had been tampered with, opened and some of the ballots therein re-marked during the period between the two counts; and that the ballots were not in the same condition as when returned from said precincts to the county clerk of Mora county.

The court thereupon rendered judgment in conformity with its findings and conclusions, awarded the office to appellee, and placed him in possession thereof. This appeal is prosecuted to review that judgment. The major portion of appellant's brief is devoted to his challenge of the sufficiency of the evidence to sustain the court's findings impeaching the integrity of the ballots opened for the recount, and discrediting the recount figures in toto. We shall therefore consider this point first, though others are also presented

and argued. No suggestion is made of tampering prior to the original count.

The ballot boxes from the various precincts of the county were duly transmitted to the county clerk following the election. The duty is imposed on him to keep and preserve the ballots, though the statute does not prescribe in terms the manner or place of keeping them. Hence, as said in Bonney v. Finch, 180 Ill. 133, 54 N. E. 318, 319: "Under the statute, it was made his [county clerk's] duty to safely keep them for six months. The statute does not specify the manner or place in which the ballots shall be kept, so that whenever the question arises, it must be determined upon all the facts and circumstances of the case."

But, by directing their transmittal to such officer, the statute unquestionably contemplates that he shall keep them in some place, ostensibly his office, where their freedom from tamperers and intruders may be secured and their integrity preserved.

The evidence disclosed that after return of the boxes from the various precincts they were placed by the county clerk in a room adjoining his office on the north assigned to the county nurse, and there remained from time of their receipt until after completion of official canvass and for an undetermined time, though not more than two or three days, following the official canvass held November 10 and 11, 1930. There was a door leading from the clerk's office into this room which latched with a hook from inside of clerk's office. There were also two doors opening from the county nurse's office into hallway of the courthouse, one of which could be unlocked with an ordinary skeleton key.

While this room was the county nurse's office, she herself physically occupied it only infrequently, being absent most of the time on her visitations around over the county. It was her custom to return to her office two or three times weekly, and, upon her return, she, of course, would have access to the same with keys carried by her. In fairness to this official, it should be said that, while opportunity for access by her to this room was shown, no intimation is made by either party that she knew of or participated in any of the tampering charged by appellee.

Night guards, one from each political party, were shown to have been maintained from the time the ballots were received until after the recount, with the exception of the period from November 11 to November 17, 1930. The evidence is quite clear that these guards were on night duty, and, except for the period mentioned when the presence of guards is not shown, the guardianship of the ballots during each night by a representative of both political parties is satisfactorily established. The presence of day guards is reflected by the testimony of a single witness that he was on day duty, but for what period of time is not stated.

These watchmen testified that they remained in the clerk's office when it was open, and, as to the guards serving during first period from November 5th to 11th, that they remained in the clerk's office all night,

the ballots being in the room immediately to the north with a door opening into same. As to the remaining period covered by their service, which extended beyond date of recount, they testified that, upon the departure each evening of the last official to leave the building they securely locked the doors to the courthouse, and then remained either in the hallways of the courthouse, or occupied the sheriff's office across the hall from the clerk's office, spending most of their time in the latter place; that from their positions in this office they could see one of the two doors to the clerk's office, but not the other one; and that these doors were always kept locked. They further testified that during their periods of service they saw or heard no one around the courthouse, nor anything to indicate the presence of tamperers. They admitted, however, that on occasions one or the other of them would lie down for a nap while the other remained on guard.

The county clerk and one of his deputies in office for the months of November and December, 1930, both affiliated with appellee's political party, testified and admitted that while about their duties in the clerk's office they could not actually see the boxes in the county nurse's room; the door between the two offices being usually closed. The deputy stated that upon leaving he always took care to see that both doors opening from clerk's office into hallway were locked, but admitted he did not exercise the same care as to the two doors opening from county nurse's office into hallway. He further admitted there were days at a time when he did

not see the ballot boxes nor enter the room where they were. Still another deputy, employed in the office a short time before and after the election, was absent, and the court did not have the benefit of his testimony.

A former sheriff of the county testified that he nailed up from inside of county nurse's office the door between it and county clerk's office some two or three days after the election, upon protest of adherents of appellant's political party that the ballots were not properly safeguarded. This occurred at 4:30 p. m. November 5th. He testified that he returned on the morning of the 7th and found the door open; that, upon inquiry of the county clerk as to who opened the door, the latter replied, "I don't know but we need that door open." The effect of the former sheriff's act was, of course, to exclude from the room in which ballots were stored the county clerk himself, the very person charged with their official custody and preservation. As against him and his deputies, mere opportunity to tamper does not raise even a suspicion. Murphy v. Lentz, 131 Iowa, 328, 108 N. W. 530. So, if intended as an intimation of tampering by them, this evidence lacks significance.

It was also in evidence from demonstrations in the presence of the court that the county clerk's keys furnished by the secretary of state to the boxes from six of the twenty-five precincts in the county would open the boxes of twenty-four of said precincts, and that one key not furnished by secretary of state would unlock at least one of said boxes. This last was shown through demonstration as result

of a wager between sheriff of said county and C. N. Higgins, one of counsel for appellant, on November 8, 1930, though admitted box was not actually opened. Evidence along this line is somewhat confusing from the fact that it is not made clear whether the keys used unlocked both padlocks required by statute on each box or only one of them. Section 41-321, Comp. 1929, requires each box to be equipped with *diverse* padlocks of Yale or similar design. Section 41-343, Comp. 1929, places custody of the key to one lock on each box in the county clerk and the other in the district judge, following the original count. The result contemplated is clearly to require the presence of each of these officials to effect entry into the boxes. In view of the testimony of the county clerk, Emilio Abeyta, who was conducting the experiment with the county clerk's set of keys, that six keys "opened" twenty-four of the twenty-five boxes in Mora county and the court's finding to same effect, we must infer that the clerk's key to a given box would unlock not only the lock for which it was made, but also the lock for which the district judge held the key.

But here again is evidence and a finding upon it, which standing alone has slight, if any, significance. For mere opportunity for access by the official custodian of the ballots or his deputies, as shown, does not create even a suspicion that they have availed themselves of such opportunity. Murphy v. Lentz, supra, a case in which a deputy of the custodian was actually the contestant. Furthermore, the opportunity of access shown by this circumstance, if existent, results from a failure of state election officials to furnish locks and keys of the kind contemplated by the statute which would preclude such opportunity. Absent fraud or change in result, this mere circumstance would be without effect to impeach the integrity of the ballots.

We come now to evidence of specific acts of tampering with the boxes from particular precincts or the absence of it. As to precincts 1, 4, and 9, reliance to impeach the recount must be had on the sufficiency of the evidence to discredit the recount as a whole. There is nothing showing improper access into any of the boxes from these precincts. Nor does it appear that the ballots from any of these precincts were inspected to discover evidences of tampering. We shall take up each of the remaining precincts separately.

*Precinct No. 2.* There was evidence regarding four ballots found at recount, one of which, introduced as Appellee's Exhibit 3, had a cross in the circle over appellant's party emblem, but a line with indelible pencil run through his name. Also as to three ballots that the name of appellee was similarly scratched out with indelible pencil. At the trial appellee's counsel was unable to find the three last-mentioned ballots, and stipulated that an examination of each ballot in precinct No. 2 disclosed only one, Exhibit 3, so marked. But as to the one, though name of appellant was the one with line run through it, the evidence stood. It was further testified that this ballot was not so marked at the original count. As to this precinct it was also testified by one witness that at the conclusion of the original count the bundles of ballots were rolled and

tied with twine and some with pieces of cloth; that at the recount six of the bundles were bound with rubber bands instead of twine or cloth.

*Precinct No. 12.* Witnesses from both political parties acting as election officials testified that, as the original count progressed, ballots were placed on a string in groups of twenty-five each to conform to the number of names on each page of the poll books and a match or piece of wood tied on the string to mark the point of division; that only the odd number of ballots, short of twenty-five, left at the conclusion of the count of a particular box, resulted in a lesser number than twenty-five in any group; that this method of stringing the ballots was employed so as to keep separate the ballots on each page of the poll books, each page of which contained a tabulation of twenty-five names. Some of the witnesses were quite positive that in no event was a greater number than twenty-five placed in one group, nor a lesser number in any case, except at the end of the count of a particular box. It was shown that, at the recount, the ballots, though still on the string, were not in the same condition. They were separated into smaller groups in some instances and several groups had more than twenty-five ballots in them; one group having twenty-eight and still another thirty-two.

*Precinct No. 15.* In this precinct it was shown that total vote cast at original count was 289 and total vote counted was 288; that there was one blank ballot cast but not counted, which upon conclusion of the count was fashioned into a cigar shaped form and rolled up inside one of the bundles of scratched ballots; that at the recount no blank ballot was found in the box, nor did any ballot appear rolled into the shape of this one. The total vote at recount was 289 instead of 288, and no blank ballot appeared in the box.

*Precinct No. 22.* Although there is statutory admonition against placing election supplies in ballot boxes, section 41-343, Comp. 1929, there was evidence that at the conclusion of the original count in this precinct the election judges placed certain election supplies, to wit, the bottle of ink, also the indelible pencils and pens inclosed in a wooden box, in the ballot box; that the wooden box was of such size that it could not be extracted through the aperture in the ballot box used for the reception of ballots; that this aperture was locked from the inside and could be unlocked only from the inside. Then follows evidence that at the recount, though the bottle of ink was still present in the ballot box, the wooden box containing the pens and pencils was missing.

The clear purport and tendency of the evidence as to the boxes of precincts 2, 12, 15, and 22, if believed, was to establish improper access to the contents of those boxes by some unauthorized person. The court accepted the testimony on these matters as credible as reflected by its findings in conformity therewith. Except as to the ballot in precinct No. 15, found blank at original count and not identified, but established as a counted ballot at recount, and Exhibit No. 3, a ballot from precinct No. 2 having appellant's name scratched out with an indelible pencil at recount, but

testified not to have been in such condition at original count, no specific instances of change or alteration of ballots in any of the precincts was shown or attempted. In fact, the ballots themselves *do not appear* to have been examined. However, this was not essential, if the court from credible evidence before it finds, as it did here, that the ballots produced for the recount were not in the same condition as when counted for the official returns at the close of the polls. If the integrity of the ballots is successfully impeached, they lose their virtue as the best or primary evidence of the result of an election, and the official returns control. 9 R. C. L., under topic "Elections," §§ 153, 154; McCrary on Elections (4th Ed.) § 478.

And it has been said that, if the custodian of all the ballots has been so remiss in the discharge of his duty of preserving them as to suggest the reasonable probability of tampering, or to create a reasonable doubt of their integrity, then none of the ballots from any of the precincts so in his custody may be resorted to to overcome official returns. Brown v. Crosson, 115 Iowa, 256, 88 N. W. 366.

A statutory recount is, of course, merely a resort to the ballots themselves as the primary and best evidence of the result of the election, as against the official returns tabulated by the election officials at the close of the polls. It involves a recount and a retabulation of the vote cast for the candidates for the particular office as to which a recount has been asked. The certificate of election based on the original count is prima facie correct. 20 C. J. 250.

But the certificate of recount likewise is prima facie evidence of the facts therein stated, and supersedes the former certificate. Section 41-621, Comp. 1929; Williams v. Bell, 184 Ind. 156, 110 N. E. 753; Looney v. County Election Board, 145 Okl. 25, 291 P. 554, 71 A. L. R. 420. Hence, upon principle, the same considerations which in the court of contest impose upon him seeking to overthrow the original returns by resort to the ballots the burden of establishing their integrity preliminary to their introduction as primary evidence of what the vote was, place the same burden on the party in the contest court who puts reliance upon the recount figures; i. e., the burden of showing that the ballots recounted were safely kept and preserved in the interim between the original and recount. The law takes the first step for him in sustaining this burden by giving prima facie effect to the certificate of recount. His opponent must then come forward with evidence sufficient to overcome the prima facie case created on this issue by the certificate of recount, if he would exclude the recount figures. And thus the duty of going forward with the evidence on the integrity of the ballots may shift back and forth until all proof on the subject is in; whereupon it becomes the duty of the trial court to determine the issue of fact thus raised. For cases and case notes dealing with burden of proof in cases of this kind, see Newhouse v. Alexander, 27 Okl. 46, 110 P. 1121, 30 L. R. A. (N. S.) 602, and note, Ann. Cas. 1912B, 674 and note; Looney v. County Election Board, 145 Okl. 25, 291 P. 554, 71 A. L. R. 420; Dutel v. Domingues, 166 La. 301, 117 So. 232.

What then is the degree of care essential to be shown in preservation of the ballots between original and recount to entitle the ballots, or the equivalent, a recount thereof, to prevail; or, to state it another way, what evidence is sufficient to impeach their integrity during this interim? The governing rules are well stated by Mr. Justice Brewer in Hudson v. Solomon, 19 Kan. 177, frequently cited and quoted with approval by McCrary on Elections at § 478, as follows:

"1st. As to the ballots cast at an election and a canvass of those ballots by the election officers, the former are the primary and controlling evidence.

"2d. In order to continue the ballots controlling as evidence, it must appear that they have been preserved in the manner and by the officers prescribed in the statute, and that while in such custody they have not been so exposed to the reach of unauthorized persons as to afford a reasonable probability of their having been changed or tampered with."

This statement of the rule does not mean that every departure from statutory requirements in the manner of preserving the ballots will destroy their effect as evidence. Rather, such departures, unless there is a statute to the contrary, will be deemed "mere irregularities which, in the absence of fraud or evidence of a change in the result, do not necessarily destroy the validity of the election nor the probative force of the ballots as evidence." Gallegos v. Miera, 28 N. M. 565, 215 P. 968, 970.

In this state no detailed manner of caring for and preserving the ballots after they reach the hands of the county clerk is prescribed. Whether they have been safely preserved is a matter then which necessarily must be determined by the trial court under all the facts and circumstances of the case before it. Its findings on the subject under well-settled principles cannot be disturbed in this court if there is any substantial evidence to support them. As said in Hannah v. Green, 143 Cal. 19, 76 P. 708: "The question whether ballots have been sufficiently taken care of so as to preclude any reasonable suspicion that they are not in their original condition is a question which is largely within the judgment and discretion of the trial court, and its determination of that question should not be disturbed here if the evidence fairly warrants the conclusion which the court reached on the subject."

In that case, it is true, the trial court was satisfied with the evidence of care exercised in preserving the integrity of the ballots and made its findings accordingly. But the rule is the same whether the court finds for or against the integrity of the ballots, so long as its finding has substantial support in the evidence. As illustrative of the care held sufficient to preserve the integrity of the ballots may be cited Dunmore v. Borough Election, 299 Pa. 517, 149 A. 733; Appeal of Armstrong, 293 Pa. 1, 141 A. 633; In re Haverford Tp. Election, 282 Pa. 504, 128 A. 499; Dutel v. Domingues, 166 La. 301, 117 So. 232; Mentzer v. Davis, 109 Iowa, 528, 80 N. W. 557; Murphy v. Lentz, 131 Iowa, 328, 108 N. W.

530. And representative cases in which the integrity of the ballots was held impeached by a want of proper care are Davenport v. Olerich, 104 Iowa, 194, 73 N. W. 603; Bonney v. Finch, 180 Ill. 133, 54 N. E. 318; Porter v. Greening, 347 Ill. 434, 179 N. E. 872; Viel v. Summers, 35 Idaho, 182, 209 P. 454; Howser v. Pepper, 8 N. D. 484, 79 N. W. 1018; Williamson v. Musick, 60 W. Va. 59, 53 S. E. 706; Farrell v. Larsen, 26 Utah, 283, 73 P. 227.

Montoya v. Ortiz, 24 N. M. 616, 175 P. 335, 338, is a case involving alleged tampering with the boxes of three certain precincts in which a recount had been demanded and conducted. Various suspicious circumstances suggestive of tampering were shown in evidence touching the physical condition of the ballot boxes from at least two of the precincts. In addition, the boxes through mistake had been erroneously transmitted to the secretary of state via Wells Fargo Express Company. The trial court rejected the recount figures from the three precincts in question, and, in sustaining its action in so doing, we said: "As to the rejection of the recount made by the board of county commissioners, it is sufficient to say that upon the state of the evidence the court properly rejected the recount. The rule is well settled that, where it is shown that the ballot boxes have been in the custody of parties not entitled thereto, the burden rests upon the contestant to show that during such time the ballot boxes were not tampered with. In this case the contestee showed that the ballot boxes for a time had been in the possession of the Secretary of State and of the Wells Fargo Express Company, and no evidence was introduced to show that during such time the integrity of the boxes was preserved. The contestee unnecessarily assumed the burden of showing that the boxes had been tampered with. We are satisfied with the rule stated in 9 R. C. L. § 153, as follows: [Quotation omitted.]"

Point is made by appellant of the circumstance that the court did not actually examine the ballots for evidence of alterations and changes. While the scratched ballots were offered in evidence in bulk, we think it is clear from the record that the court did not actually inspect the ballots. It rather took the view that the evidence of the preservation of the ballots between the two counts was such as to show reasonable probability of tampering with all of the boxes, and that actual improper and unauthorized entry into the boxes of four of the seven precincts recounted had been shown. It found that these circumstances discredited the entire recount.

The lower court's view of the law was correct as held in Montoya v. Ortiz, supra. Clearly the evidence, as summarized hereinabove, if believed, furnished substantial support for the material findings made by the trial court. It was essentially its province to weigh the evidence and pass upon the credibility of the witnesses.

In so holding we attach no significance to the circumstance, standing alone, of a difference in recount and original results, a point much dwelt upon by appellee. The mere difference in the counts would not of itself support even a suspicion of tampering. Were it

otherwise, a successful candidate on recount, by making gains, would at the same time and by virtue thereof so impeach the integrity of the ballots recounted as to deny him the benefit of the gains made.

The recount results being eliminated by the findings of the lower court, there was nothing for it to do but render judgment for contestant (appellee here). Upon the official returns he had a clear majority of the votes cast. The appellant being bound by those findings in this court, where substantially supported by the evidence, as we hold they are, there then remains nothing for us to do but affirm the judgment based thereon. This leaves undetermined several interesting questions raised by the parties in their briefs, which become unimportant in view of the conclusion reached.

The judgment appealed from will therefore be affirmed, and it is so ordered.

BICKLEY, C. J., and WATSON and HUD-SPETH, JJ., concur.