**NATIONAL FEDERATION OF RAILWAY WORKERS v. NATIONAL MEDIATION BOARD et al.**

No. 7422.

United States Court of Appeals for the District of Columbia.

Decided Jan. 8, 1940.

Writ of Certiorari Denied May 6, 1940.

See — U.S. —, 60 S.Ct. 975, 84 L.Ed. —.

James A. Cobb, of Washington, D. C., for appellant.

Robert L. Stern, of the Department of Justice, and William E. Willis, both of Washington, D. C., for appellees.

Before STEPHENS, VINSON, and RUTLEDGE, Associate Justices.

VINSON, Associate Justice.

This is an appeal from an order of the district court dismissing appellant's complaint.

The appellant, National Federation of Railway Workers (the Federation), an unincorporated association of colored railway employees, for some time prior to June 1937, represented the craft of coach cleaners employed by the Texas Pacific Railway Company (the carrier) for purposes of collective bargaining.

A contest developed, however, between the Federation and a rival organization, the Brotherhood of Railway Carmen of America, affiliated with the American Federation of Labor (the Brotherhood) as to representation of said employees. Both associations circulated "authorization cards" among the coach cleaners for signature indicating a preference for the particular association as the collective bargaining agency, and the Brotherhood filed an application, dated June 16, 1937, with the National Mediation Board (the Board) asserting that a dispute had arisen as to the proper representative of the craft of coach cleaners, and that a substantial number of the said employees had authorized the Brotherhood to represent them. On June 18, 1937, the Board wrote to one F. W. Washington, General Chairman of the Federation, informing the Federation, through him, of the Brotherhood's application for an election. On June 23, 1937, Washington replied in behalf of the Federation stating that "the majority of the Coach Cleaners employed by * * [the carrier] * * * choose by their signature the representation of the * * Federation * * *." On June 26, 1937, Washington, in a letter to one C. W. Rice, a Federation organizer, designated the latter to act for the Federation in the case. A copy of that letter was sent the Board.

Section 2 of the Railway Labor Act, 45 U.S.C.A. § 152, authorizes the Board to investigate representation disputes and certify the proper representative after one of the parties to the dispute makes application to it. Pursuant thereto, the Board, on November 24, 1937, notified the Federation that a mediator would be in Dallas, Texas, November 29, 1937, to investigate the dispute. The mediator, Robert F. Cole, there conferred with representatives of each association. The Brotherhood exhibited "authorization cards" bearing the names of 42 coach cleaners indicating that they desired Brotherhood representation, while the Federation presented the argument that no dispute existed since the coach cleaners had negotiated a contract with the carrier respecting their employment through the Federation, and were satisfied with the same. After securing from the carrier information as to the total number of coach cleaners employed, Cole wired the Board that there were 86 employed in all, and that 42 of them had signed "authorization cards" for the Brotherhood. Shortly thereafter, on Dec. 2, 1937, the Board ordered an election. Personal notice of the election and of the right of each association to appoint an election observer was given to F. W. Washington for the Federation. Notices concerning the approaching election were delivered to the carrier to be posted on bulletin boards seen by the coach cleaners over the entire system.

The election, secret ballot in nature, was conducted in two parts. The first, held in Fort Worth, Texas, on Dec. 4, 1937, was personally conducted by Cole assisted by F. W. Washington acting as "election observer" for the Federation, and Edward M. Ware, General Vice-President of the Brotherhood, acting as "election observer" for the Brotherhood. At that election, held at the time and place designated, 35 "box-votes" were cast. The second part of the election was conducted by mail, and in that "mail election", held in the period December 4-10, 1937, 42 other ballots were received. Of the 77 votes cast, the Brotherhood received 42 and the Federation 35. On December 17, 1937, the Board certified the Brotherhood as the proper representative for the craft.

The Federation, through its officers, made several protests to the Board against the result of the election, charging certain irregularities in its conduct, and discrepancy

between the votes actually cast and the announced result.[1] These protests and petitions for a new election were denied, and the Federation, on March 29, 1938, filed this suit in the district court against the Board, as defendant, seeking a declaration that the certification of the Brotherhood was void, and to enjoin the Board from putting such certification into effect. The Brotherhood was permitted to intervene. Upon final hearing of the case the district court dismissed the complaint.

The Federation appeals from that order of the district court and, for purposes of argument, has consolidated its numerous assignments of error into four principal contentions respecting: (1) the Board's determination that a representation dispute existed; (2) the observer representing the Federation at the election; (3) the integrity of the election; (4) the effect of Brotherhood certification on constitutional rights of Federation members.

### I. The Board's Determination that a Dispute Existed

The Federation contends that the Board's determination that a representation dispute existed among the coach cleaners was not based upon sufficient evidence and hence the election must be treated as a nullity.

 In endeavoring to disprove the existence of a dispute, the Federation pointed out that the coach cleaners had negotiated a contract with the carrier respecting their employment through the Federation, and were satisfied with the same at the time the Board determined that a dispute existed. The fact that employees have amicable relations with their employers does not, however, preclude the existence of a dispute inter se as to the representative for collective bargaining purposes. Indeed, a representation dispute within the meaning of Section 2 of the Railway Labor Act, 45

U.S.C.A. § 152, is a "dispute * * * among a carrier's employees as to who are the representatives of such employees * * *." (Italics supplied.)

We come now to a consideration of the evidence supporting the Board's determination that a representation dispute existed. It appears from the record that at the time the Board made that determination it had before it the following evidence:

(1) The Brotherhood had applied to the Board for an election asserting in their application that a representation dispute existed, and that a substantial number of coach cleaners had signed "authorization cards" indicating that they wished the Brotherhood to act as their representative. It was stated in the application that these cards would be available to the Board's investigator.

(2) The Board had notified F. W. Washington, General Chairman of the craft of coach cleaners in the Federation, of this application, and in response thereto received a letter from him on June 23, 1937, stating that "the majority of the Coach Cleaners employed by the * * * [carrier] * * * choose by their signatures the representation of the * * * Federation * * *".

(3) The Board had dispatched its own investigator, Cole, to the scene and he, after conferring with representatives of each association, sent a wire to the Board advising them of the number of coach cleaners and the number that had signed "authorization cards" for the Brotherhood.

 The Federation argues that the refusal of the Board to divulge the names of the 42 "authorization card" signers, upheld by the district court, necessitates disregard of Cole's telegram to the Board as evidence to support its determination that a dispute existed and cites United States v.

---

[1] There were three protests in the nature of petitions for rehearing, and two petitions for a new election filed with the Board.

The first protest came from the general president of the Federation charging that Ed Carter, General Chairman of the Shop Laborers, should have been notified of the election and permitted to act as observer for the Federation rather than Washington.

The second protest, and a petition for a new election, came from Rice and charged that Cole was bound to notify him of the election and to permit him to act

as the Federation's election observer, and further that a majority of the coach cleaners desired Federation representation.

The third protest, and a second petition for a new election, also came from Rice and charged (1) that Rice should have been notified of the election and permitted to act as an election observer; and (2) that Cole's report of the election result was false and, in support of this last charge, affidavits of 41 coach cleaners stating that they had voted for the Federation in the election were attached to the protest.

Abilene & Southern Railway Co., 265 U.S. 274, 44 S.Ct. 565, 569, 68 L.Ed. 1016, for the proposition that "Nothing can be treated as evidence which is not introduced as such".

In as much as the record clearly shows that, at the time it ordered the election, the Board had before it only the number of those who signed "authorization cards" and not their names, the Board did not "treat as evidence" those names and the Federation's argument battles with a non-existent foe. Nor does the result differ if evidence before Cole is treated as evidence before the Board. The record shows that the Federation has made no charge that the names on the 42 Brotherhood "authorization cards" were forged or the names of men not employed by the carrier as coach cleaners. That being the case, the identity of the signers was irrelevant and immaterial and the district court properly so ruled. Moreover, there are grave reasons of policy favoring non-disclosure of the names of those who sign such "authorization cards". We need not dwell upon the desirability of freedom from coercion for workmen in their choice of representatives. The reasons that demand secrecy in an election of this type are equally cogent in respect to a petition for an election. It has been pointed out that "it is necessary to prove only that a dispute exists among the employees as to the identity of the representative. It is not necessary for the labor organization to prove that its membership constitutes a majority of the employees in the plant." [2]

It is clear that the district court here ruled correctly in denying the Federation access to the names of the "authorization card" signers. [3]

▮ The Board determined on the basis of the evidence before it that a dispute existed among the coach cleaners as to whether the Brotherhood or the Federation should be their representative. That evidence, as above set forth, is substantial in nature. Where a finding of the Board is supported by substantial evidence it is not to be disturbed by the courts, [4] and especially so here in view of the concurrence of the district court in that finding. Since the determination by the Board that a dispute existed is supported by substantial evidence, we find it unnecessary to decide here whether in the absence of such evidence an election order by the Board would be a legal nullity.

We note in passing that the Federation did not raise this issue concerning the existence of a dispute in either its protests to the Board or its complaint in this action.

## II. The Federation's Election Observer

The Federation's second contention is that the Board, after announcing that each organization might appoint an observer to oversee the election, failed to notify the proper Federation official of the election and the right to appoint an observer thereby rendering the election a nullity.

Decision as to the merit of this contention requires a rather detailed consideration of certain facts of record respecting the conduct of the election in question.

F. W. Washington, the Federation's general chairman of coach cleaners, was the official to whom the Board sent notice of the Brotherhood's application for a representation election and he replied in behalf of the Federation. At a committee meeting in June 1937, which one C. W. Rice, a Federation organizer, attended, Washington designated Rice to represent the Federation in the case. Washington also gave Rice a letter, under date of June 26, 1937, evidencing that authority and a copy thereof was sent the Secretary of the Board. Thereafter the Board's Secretary wired representatives of the Federation stating that Cole would be in Dallas, Texas, on November 29, 1937, to start his investigation. A committee of the Federation, including Rice and Washington, met with Cole in Dallas. At that meeting Cole directed most of his questions to Washington and Ed Carter, general chairman of the shop laborers, (application for an election had also been made

[2] In the matter of Samson Tire and Rubber Corp., and United Rubber Workers of America, 2 N.L.R.B. 148, 156. This case arose under the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., but the procedure followed in respect to representation disputes is similar to that under the Railway Labor Act, 45 U.S.C. A. § 151 et seq. See National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 44, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352.

[3] Cf. Wigmore, Evidence (2d Ed. & 1934 Supp.) § 2374.

[4] Brotherhood v. Kenan, 5 Cir., 87 F. 2d 651, 654; Nashville, C. & St. L. Ry. v. Railway Employees', 6 Cir., 93 F.2d 340. See Shields v. Utah Idaho C. R. Co., 305 U.S. 177, 184, 185, 59 S.Ct. 160, 83 L.Ed. 111.

in respect to the latter craft) "since they were the men who lived right on the property and knew the answers to the questions". (Cole's testimony.) Rice talked generally about the desirability of a separate labor organization for colored workmen. Near the close of the meeting Cole stated that the Board would make the decision as to whether an election would be held. Concerning Cole's subsequent statements, there is a conflict in the testimony. Rice and two other witnesses stated that Cole told Rice that he would notify him as to whether an election would be held. Cole and Washington denied this and testified that he took the addresses and phone numbers of Rice, Washington and Carter, stating that he would get in touch with Rice if he needed him further, and that he would get in touch with the general chairman of both crafts "if he needed further information or any further action".

Shortly after this conference, Cole wired the result of his investigation to the Board and thereafter received instructions to proceed with an election in the craft of coach cleaners. Notice of the election was posted and Section 4 thereof provided in part as follows: "Each organization * * * that is a party to this dispute, if it so desires, may appoint an observer to assist in distributing, collecting and counting of ballots, and in identifying voters. But observers must do no electioneering". Cole notified Washington and a representative of the Brotherhood that each association was entitled to appoint an observer, and both men stated that they would serve in that capacity, which they did.

The Federation contends that Cole was bound to notify Rice of the election and the organization's right to appoint an observer, and that his failure to do so, in effect, deprived the Federation of the right to appoint an observer as provided by the rules announced to govern the election with the result that the election must be regarded as a legal nullity.

In respect to this contention it should be observed at the outset that Section 2 of the Railway Labor Act, supra, provides that the Board may "establish the rules to govern the election" but contains no provision requiring the presence of observers at such elections. The district court held as a matter of law that the Board was not required to provide for "election observers" representing the contending associations.

The Board's practice, however, and that followed in the instant case permitted the designation of such observers. Assuming, without deciding, that the rule as announced was binding on the Board in its conduct of the election, it is doubtful whether, as a matter of law, any notice to the Federation of the election and of its right to appoint an observer other than that contained in the posted notice of election was necessary in view of the finding of the district court that "Actual notice of the election was given to practically every coach cleaner".

Personal notice was given, however, to F. W. Washington, a coach cleaner in the employ of the carrier, and general chairman of the craft, for the Federation, rather than to Rice, a Federation organizer, neither a coach cleaner nor employed by the carrier. Section 4 of the notice of election makes it clear that the Board did not assume the responsibility of selecting an observer. That responsibility rested with the two associations. Any responsibility the Board may have in respect to giving personal notice of an election to a contending association must be limited to giving such notice to a proper official of the association. Washington's office was such that he appeared to be a proper person to receive notice for the Federation of an election in the coach cleaner's craft and of the right to appoint an election observer,[5] and the district court so found. Some testimony was adduced to

[5] The following statement is taken from the testimony of Rice:

"On each road or group of roads there is a general chairman for each craft, who signs agreements made in behalf of such craft; the general chairman being chosen by the men themselves. Between elections if a dispute arose the president had the power to designate whomever he wanted to act as general chairman, if the regular chairman was unfamiliar with or unable to do the signing up for the Federation. Ed Carter, as General Chairman for the shop laborers on the Texas and Pacific signed the agreement in behalf of the shop laborers. F. W. Washington, up to December, 1937, was general chairman for the coach cleaners, and in 1935 and early in 1937 he signed agreements on behalf of the coach cleaners, both the present agreement and the earlier contract or agreement being signed by F. W. Washington as a representative of the National Federation of Railway Workers. No one else signed those contracts on behalf of the Federation."

the effect that ordinarily the general chairman was so regarded. [6]

It is true that Rice had been designated in the month of June 1937, preceding the election of December 1937, as the Federation representative in respect to the dispute, but his authority came from Washington and the latter continued to hold the post of general chairman of the craft until after the election. [7] The record indicates that the Board from the outset addressed its Federation communications to Washington. [8] The record clearly shows, and the district court found, that the Board received no information before or during the election that there was any question as to Washington's status in the Federation, or his fitness to act as an observer.

■ Under all these circumstances, we cannot say that Washington's designation of Rice in June 1937, to represent the Federation in the case, or the conflicting testimony as to whether Cole indicated to Rice that he would inform him in respect to an election, would justify this court in disturbing the finding of the district court that Washington was a proper person for the Board to notify concerning the election and of the right of the Federation to appoint an observer.

■ It should be pointed out that even if the Board erred in permitting Washington to act as the Federation election observer, such error would not justify nullifying the election which was in all respects fairly and honestly conducted. [9] In System Federation v. Virginian Ry. Co., D.C., 11 F. Supp. 621, affirmed, 4 Cir., 84 F.2d 641, affirmed, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789, it appeared that the observer for one contending association also belonged to and was active in the rival association. It was held that this dual membership on the part of the observer would not affect the validity of an otherwise fairly conducted election.

We cannot but conclude that the district court properly rejected the Federation's contention respecting their election observer.

### III. The Integrity of the Election

In its third contention the Federation charges that the election was fraudulent, that Cole's report of the election was false and fraudulent, and that a majority of the votes were in fact cast for the Federation.

■ (a) The charge that the election was fraudulent.

The district court found that "The election was in all respects fairly and honestly conducted * * *". There is in the record substantial evidence to support that finding and none at all to the contrary. The procedure followed in this election was such that any other state of the evidence would be indeed surprising. [10]

---

[6] Ed Carter, general chairman of the craft of shop laborers for the Federation, testified that by virtue of his position as general chairman he was the proper person to whom any notice of an election for the craft of shop laborers should be directed.

[7] Both Rice and Washington stated directly that Washington held the post of general chairman until after the election, and Carter inferentially testified to the same effect.

[8] C. W. Rice testified that all members of the committee that met with Cole in Dallas received telegrams from the Board stating that Cole would be in that city on November 29, 1937. Washington was a member of that committee. Washington testified that Rice received the "same notice from the National Mediation Board" and notified Washington that he should go to Dallas as a member of the committee to meet with Cole. It thus appears that the Board addressed all of its communications to the Federation either exclusively to Washington or to him in common with other representatives of the organization.

[9] See infra note (10).

[10] Prior to the election Cole secured from the carrier a list of the names of the men employed as coach cleaners, and this list of eligible voters was submitted to and approved by Washington, the Federation election observer, and Ware, the Brotherhood election observer. In order to avoid the expense of running over the large Texas and Pacific system, it was decided that the election would be held by mail except in Fort Worth, Texas, where about half of the coach cleaners resided.

On December 4, 1937, the posted date of the election, Cole and the two observers met in Fort Worth to conduct the same. An election booth was set up in the "clock room" opening off of the foreman's office in the carrier's yards, as per the notice of election. Cole and the two observers stationed themselves in the foreman's office. Each of the three men had a list of the eligibles and they checked off the name of each man as he came to vote, and the ballots were initialed by all three men to prevent the box from being stuffed". The actual marking of the bal-

(b) The charge that Cole's report of the election was false and fraudulent.

A charge that the certified result of the election was inaccurate because of mistake or fraud should insure a recount of the ballots, if properly preserved. Ballots are said to be the best evidence for determining the outcome of an election and resort is had to them when an attempt is made, on proper grounds, to impeach the certified return of the election officials. [11]

In the instant case the ballots were before the court and a finding was made that "the report * * * accurately stated its [the election's] results" and the Court further found that "out of eighty-six eligible voters, forty-two votes were cast for the Brotherhood and thirty-five for the Federation". Moreover, counsel stipulated that the ballots were so marked. The attempt to impeach the certified election return therefore fails.

(c) The charge that a majority of the votes in the election were in fact cast for the Federation.

Since it was stipulated that the certified return was supported by the ballots as marked, this charge that a majority of the votes were actually cast for the Federation constitutes an attempt to impeach the ballots themselves and to that end the Federation attached to its complaint affidavits, and introduced into evidence depositions, of a number of coach cleaners to the effect that they had in fact voted for the Federation.

Neither the affidavits attached to the complaint, nor the depositions introduced at the trial were competent as evidence to impeach the ballots. Where no other evidence of fraud, irregularity, or illegality is introduced, the sworn statement of a voter concerning the nature of his vote is not competent evidence and should not be admitted to impeach the ballots. [12] Any other rule would

---

lot took place in the "clock room", where the men voted, one by one, in secrecy. The ballots were placed in a locked ballot box. After all ballots had been cast that would be cast at Fort Worth, ballots were initialed and mailed to the other eligible voters together with two envelopes. The larger of these two envelopes was addressed to the postmaster at Dallas, Texas, and bore, in the upper left-hand corner, the name of the voter. The other, smaller, envelope, in which the ballot was to be placed, had no identifying marks thereon, and was to be sealed, placed in the larger envelope and mailed.

The ballots cast in Fort Worth (35) were sealed in a large manila envelope by Cole and the two observers and mailed to the postmaster at Dallas to be held for the Board. On December 10, 1937, the announced deadline for mailed ballots, Cole and the two observers met in Dallas and after they submitted the prearranged identification to the postmaster there, he turned over to them mail addressed to the Board in his care. The three men then checked off the names of those who had mailed in ballots by reference to the name printed on the upper left-hand of the outside envelope. The outer envelopes of the mailed ballots were then destroyed and the sealed ballots (mail and box) now all without identification, were mixed together. The ballots were then opened and counted by the three men. The count showed 77 votes cast—42 for the Brotherhood and 35 for the Federation. No votes were recorded for the nine other men eligible to vote. Two of these nine bal-

lots were returned too late to be counted, marked for the Brotherhood. Three were returned by the postal authorities as not having been delivered, and four were not returned at all.

The result was reported to the Board by Cole, and both Ware and Washington certified by their signatures that the election was fairly conducted, that the secrecy of the ballot had been kept inviolate, and that the tabulation of votes was accurate and complete.

[11] Land v. Land, 244 Ky. 126, 50 S.W. 2d 518, 526; State ex rel. Millinor v. Smith, 107 Fla. 134, 144 So. 333, 336; Porter v. Greening, 347 Ill. 434, 179 N.E. 872, 873; Annotation, 30 L.R.A., N.S., 602 and cases cited; 18 Am.Juris, § 306 Elections; McCrary, Elections, s. 474. See also cases cited infra note 12.

[12] Carabajal v. Lucero, 22 N.M. 30, 158 P. 1088, 1092, 1093; Siler v. Brown, 215 Ky. 199, 284 S.W. 997, 1004; Condren v. Gibbs, 94 Ark. 478, 127 S.W. 731, 732; State ex rel. Cremer v. Steinborn, 92 Wis. 605, 66 N.W. 798, 53 Am. St.Rep. 938; Easterbrooks v. Atwood, 83 Vt. 354, 76 A. 109, Ann.Cas.1912A, 295; Paine, Elections s. 767, 772.

Cases where sworn statements of the voter concerning the nature of his vote have been admitted, in almost if not all instances, involved admission of other evidence of illegality, irregularity, or fraud. See People v. Wintermute, 194 N.Y. 99, 86 N.E. 818 (evidence that voting machine did not function properly—sworn statements of the voters concerning their votes admissible).

open the floodgates to second "oath elections" conducted by the court with consequent loss of the freedom of choice associated with the secret ballot. We find it unnecessary here to decide what proof of fraud, irregularity or illegality would be a sufficient predicate for the introduction of a voter's sworn statement concerning his vote. It is sufficient to note that no such evidence was offered.

But, aside from its competency as such, this evidence offered by the Federation tended to establish the validity of the ballots and the accuracy of Cole's report rather than the contrary. The affidavits of some 41 coach cleaners to the effect that they had voted for the Federation in the election were attached to the complaint. Of this number, seven repudiated their affidavits at the trial stating variously that they were coerced by threats of discharge, cajoled with promise of reemployment, or hurried, without knowledge of the nature of the paper, into signing these affidavits.

The Federation also secured an order of the court authorizing it to take the depositions of some 60 coach cleaners. At the trial depositions of only 44 were introduced. Of this number, 7 indicated that they had voted for the Brotherhood. The Federation thus mustered only 37 coach cleaners who would state that they had voted for it in the election, and the record indicates that of this number two had not voted at all and one had voted for the Brotherhood. The Federation, on its own theory, failed to establish the number of ballots marked for it and credited to it by the Mediator's report.

We cannot disturb the finding of the district court that the Brotherhood received 42 votes in the election to 35 for the Federation, the result announced by the Board.

IV. The Effect of Brotherhood Representation on Constitutional Rights of Federation Members.

The fourth contention of the Federation is that certain rules of the Brotherhood so proscribe the role colored men may play in that organization that representation by it of the coach cleaners will deprive members of the Federation of the equal protection of the laws and of property without due process of law in violation of the 14th amendment, U.S.C.A.Const.

The constitution of the Brotherhood provides, in Section 6 (c), as follows: "On railroads where the employment of colored persons has become a permanent institution, they shall be admitted to membership, in separate lodges. Where these separate lodges of negroes are organized they shall be under the jurisdiction of and represented by the delegates of the nearest white local in any meeting of the Joint Protective Board, Federation, or convention where delegates may be seated". Its constitution thus seems to indicate that colored participation in the Brotherhood is limited to membership in these separate lodges, and the Federation contends that Brotherhood representation means that the officers bargaining with the carrier in behalf of the coach cleaners will not be colored.

Would such a limitation by the Brotherhood on the rights of its colored members operate here to deprive members of the Federation of any constitutional rights?

The guarantees of the 14th amendment, U.S.C.A.Const., relate solely to action by a state government,[13] clearly absent here. Hence, any constitutional rights pertinent to the instant case are those guaranteed by the 5th amendment. Decisive of this constitutional issue is the established proposition that the 5th amendment relates only to governmental action, federal in character, not to action by private persons. Corrigan v. Buckley, 271 U.S. 323, 330, 46 S.Ct. 521, 70 L.Ed. 969. Thus the Brotherhood, a private association, acting on its own initiative and expressing its own will, may limit the rights of its colored members, without thereby offending the guarantees of the Constitution. Cf. Grovey v. Townsend, 295 U.S. 45, 55 S.Ct. 622, 79 L.Ed. 1292, 97 A.L.R. 680.

The only governmental action in respect to the instant case consisted in the enactment of the Railway Labor Act and the functioning of the Board thereunder. Section 2 of the Act provides that the "majority of any craft * * * shall have the right to determine who shall be the representative of the craft * * *". and the Board is authorized to conduct elections to determine such representative. The term "representative," as found in the act, is defined to mean "any person or persons, labor union, organization, or corporation designated * * * by * * * employees, to act for * * * them."

---

[13] Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835; Corrigan v. Buckley, 271 U.S. 323, 330, 46 S.Ct. 521, 70 L.Ed. 969.

Thus, under the Act, employees are guaranteed the right to select a common bargaining representative and that representative may be a person of any race or color (or an association made up of persons of any race or color). The quality of opportunity thus guaranteed is the complete antithesis of discrimination. To hold that colored employees could be represented only by colored persons for bargaining purposes would be to introduce into the administration of the Act the very discrimination which the Federation seeks to avoid.

In the election at hand a craft of 86 coach cleaners, 70 of whom were colored, by a vote of 42 to 35 chose as their collective bargaining agent or representative the Brotherhood of Railway Carmen. It may be that certification of the Brotherhood will mean that white, rather than colored, men will represent the coach cleaners in negotiations with the carrier. If so, that condition will obtain because a majority of the coach cleaners voted for it, and not by reason of any governmental action. Moreover, it can continue only so long as they desire it. It cannot be that the Constitution denies colored workmen the right to select a white representative or vice versa. The argument that the Brotherhood is not a proper representative for colored coach cleaners therefore spent its force in the pre-election campaign, and, the result indicates, to no avail.

In the last analysis, the Federation's contention reduces itself to the proposition that the members of every race in a craft of workmen have a constitutional right to representation by one of their own race, which neither the majority of the craft nor their own race may take from them. Acceptance of such a principle would certainly destroy the bargaining advantage of the united front secured to employees by the provision of the Act that a majority of any craft shall select the representative for the craft.[14] The Federation really objects to the principle of majority rule as applied to the selection of the bargaining agency or representative. It is clear beyond doubt that constitutional objection to majority rule in the selection of an employee bargaining agency cannot prevail. Virginian Ry. Co. v. System Federation, 300 U.S. 515, 516, 548, 57 S.Ct. 592, 81 L.Ed. 789; National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 44, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352. Cf. Grovey v. Townsend, supra.

We conclude that the action of the district court in dismissing the complaint was proper and that the judgment should be affirmed.

Affirmed.

---

[14] The employer may bargain collectively with his employees only through the representative selected by the majority. Virginian Ry. Co. v. System Federation, supra.