JOSEPH P. HARRIS (PLAINTIFF), APPELLANT, v. CITY OF ST. LOUIS, A MUNICIPAL CORPORATION, ET AL. (DEFENDANTS), RESPONDENTS. —111 S. W. (2d) 995.

St. Louis Court of Appeals. Opinion filed January 4, 1938.

*Sidney R. Redmond* and *Henry D. Espy* for appellant.

*Edgar H. Wayman* and *Oliver Senti* for respondents.

HOSTETTER, P. J.—This is an action brought in the Circuit Court of the City of St. Louis on August 27, 1934, by complainant, Joseph P. Harris, a colored citizen, resident and taxpayer of said city.

The suit was brought against the city of St. Louis and certain officers of said city and it was sought by complainant to enjoin all of the respondents from leasing, hiring or permitting the building known as the Municipal Auditorium and Community Center Building, or parts thereof, to be used for performances at which negroes were denied the same rights of admission as any other race solely because of race or color.

Testimony was heard *pro* and *con* by the trial court on the issues raised by the pleadings, which included a visit by the trial judge to the building itself, and the various parts thereof in the presence of counsel for both complainant and respondents, at which time an ocular examination of the buildings was made and the acoustic properties of various parts were tested.

At the conclusion of the testimony the complainant asked the court to make certain finding of facts and to give certain conclusions of law, which in substance were in consonance with the allegations set out in the amended petition, which the court refused to do, but did make certain finding of facts and conclusions of law which resulted in the dismissal of complainant's petition and the rendition of a judgment in favor of the respondents.

Thereupon, after the overruling of complainant's motion for a new trial, complainant duly perfected an appeal to the Supreme Court. This appeal was evidently taken to the Supreme Court on the erroneous assumption that a constitutional question was involved in the case, but the case was subsequently transmitted to this court by the Supreme Court on the ground that it was without jurisdiction to hear and determine it on the appeal, thereby, in effect, holding that no constitutional question was involved.

We have carefully examined the record in this case and the finding of facts and the conclusions of law promulgated by the learned trial judge and we are impressed with the idea that the same fully covers the issues and we feel justified in adopting it *in toto* as our statement and reasons for reaching the same conclusion.

We borrow the speech which the Bard of Avon put into the mouth

914

of Salisbury, one of the courtiers in opposing the suggested second coronation of King John, which runs as follows:

"Therefore, to be possess'd with double pomp,
To guard a title that was rich before,
To gild refined gold, to paint the lily,
To throw a perfume on the violet,
To smooth the ice, or add another hue
Unto the rainbow, or with taper-light
To seek the beauteous eye of heaven to garnish,
Is wasteful and ridiculous excess."

King John, Act IV, Scene II.

The following is the production of the trial judge:

"This case, filed August 27, 1934, was heard October 11, last on a return to an order to show cause issued September 24, was later fully briefed and argued, and on April 8, the return was refiled as an answer and reply filed and cause submitted on the merits on the evidence heard in October.

"The petition alleges plaintiff is a citizen and resident of St. Louis for forty years, a taxpayer and owner of real estate, and that he brings the action for himself and such other citizens as care to join therein. Makes suitable allegations identifying the defendants, the City of St. Louis, the City Treasurer, H. C. Menne, Director of Public Service, Joseph M. Darst, Manager of the Auditorium James Darst, and states the other defendants are Members of the Municipal Auditorium Commission, a body created by City Ordinance No. 40145. Alleges that pursuant to the Constitution of the State, the Charter of the City, and a City Ordinance , a bond issue of $5,000,000 was proposed and adopted by a vote of the people to acquire a site and a civil building, to be known as the 'Municipal Auditorium and Community Center Building' to be used holding public meetings, gatherings, conventions to discuss public questions . . . and to provide suitable meeting places for educational, moral, musical, industrial, labor and other purposes. That the building is now wholly or partly completed and is being used for and by some citizens and taxpayers to the exclusion of others. Ordinance No. 40145; approved June 27, 1933, is pleaded whereby the Commission was authorized and its power and duties defined. The Commission consisting of the Mayor, the Comptroller, the President of the Board of Aldermen, the City Counselor, the Director of Streets and Sewers, the Director of Public Safety, five Members of the Board of Aldermen, selected by that body, and seven others to be appointed by the Mayor, to hold office during his pleasure, to represent certain bodies, convention bureau, etc., etc., all serving without compensation. The Commission to act in an advisory capacity in the management, control and use of the building, with power to make rules and regulations, cooperating with civic bodies that work to the same end to

secure events appropriate for the Auditorium and Community Center, and which would benefit the City. The Commission to establish a schedule of charges for the use of the building, and with the right to exempt in whole or in part from any charges for use by the convention of an organization which might draw an attendance that would result in a considerable return to the City. All monies collected for the use of the Auditorium and Center to be deposited with the City Treasurer, The Convention, etc., Bureau to be afforded sufficient office space to aid its civic activities in bringing events here, and to be charged for space, heat, etc., as determined by the Commission. Plaintiff alleges he is a Negro and that the Commission, in violation of the Constitution, Charter, and Ordinances, have deprived him and all Negroes of the full and same right of admission to public attractions given in the Auditorium, and of the benefits derived from the building. That he has been taxed for the erection, upkeep, etc., of the building and this money and the money of thousands of other Negroes, as part of the general revenue of the City, is used for this public building and it is operated in an illegal manner by defendants in that they discriminate against Negroes, and deny them admission to public performances, therein, and the use of the revenue while such discrimination continues is illegal. That as a subterfuge the defendants have concocted a plot whereby the large auditorium is rented to individuals who connive with defendants and are permitted and encouraged and allowed to refuse to sell tickets of admission to public performances to Negroes solely because they are Negroes. That he has no remedy at law and hence prays equitable relief to-wit, to enjoin defendants, etc., from leasing, renting, etc., said building or parts thereof for performances for educational, etc., purpose that promote the commonwealth at which plaintiff or members of the Negro race are excluded or denied the same rights of admission as any other race, solely because of their race or color, and from paying City funds to maintain, etc., the building until it is operated so there will be no race segregation or discrimination, etc.

"The answer makes some formal admissions, and then specifically denies any taxpayers use of the building to the execlusion of others, and denies they have deprived plaintiff and all others of his race of the same right of admission to, and opportunity to attend public attractions given in the Auditorium, and deny they are depriving them of benefits, etc., derived from the building. Deny illegal operation of the building by discrimination or that there was a plot or a conniving with others to refuse to sell Negroes as alleged. The reply is in effect a denial of defendants' denials.

"The evidence was, in substance, that plaintiff, resident here over fifty years, a taxpayer about thirty years, and a deputy clerk in our Probate Court, and others of his race, all who testified being

very respectable persons engaged in various occupations, had sought to buy tickets for admission to different parts of the Auditorium to hear grand opera, presented to the public by Mr. Guy Golterman, the licensee from the City, which acted through the Municipal Auditorium Commission, for a period of some weeks in the spring of 1934, when the Auditorium was first opened to the public, and again in the fall of that year. The license, which seems to have been based on forms used in other cities, was nonassignable and revocable, and reserved the right of the City to control the management of the Auditorium, and to enforce all necessary rules for its management and operation. It provided for certain payments for the use of the Auditorium, and contained numerous provisions of no moment here. There was nothing in the license that in any way restricted the right of the licensee to say that Negroes, or any other persons of whatever kind or race, should not be permitted to occupy seats except in such parts of the house as the licensee might designate for their use. Plaintiff and his witnesses testified they sought to buy tickets of admission at the office on Olive Street where tickets were sold and were denied the right to buy seats save certain side seats on the main floor and certain one dollar seats in the upper balcony. More expensive and more desirable seats not being sold to Negroes. There was some question of whether this refusal was by direct authority of the Commission through Mr. Darst or because of Mr. Golterman's orders, but that is immaterial for this reason. A committee, thoroughly representative of the colored people, had a conference with the Mayor, and others representing the Commission, protested against the discrimination as to their people, and suggested a clause in the license contracts forbidding same. The result was that on May 18th a letter was sent the chairman of the Committee, Mr. R. N. Owens, signed by Mr. James E. Darst for the City Commission reading as follows:

" 'At its last meeting the Auditorium Commission heard your letter and directed me to refer you to a rule of the Commission, made at a pervious meeting:

" 'When the Auditorium Commission through the Manager leases any part of the Auditorium, for any sort of dramatic production, concert, reception, athletic event, etc., it shall leave to the discretion of the lessee any regulations regarding admission, price, sale of tickets and such matters.

" 'The Commission ruled that this applied to the admission of persons of various races and that it was within the province of lessee to say who should be admitted and under what conditions.'·

"This is a very explicit statement of the City's position and policy which the evidence shows remains unchanged. There has been some modification by Mr. Golterman by way of liberalizing his policy as to seats for colored people, instead of being limited to parts of the

upper balcony on the right and left of center, they may now occupy any balcony seats. They could formerly buy only some seats in the rear sides of the main, or orchestra, floor, which seats 1770 people. It does not appear explicitly what is the present rule as to that floor but the Court's conclusion from the evidence is that the rule as to that floor has not been changed. The second floor is arranged thus: In front a row of boxes seating, in all, 108; then two rows of mezzanine seats for 120; then the lower balcony, called at the hearing the dress circle, rows A to L inclusive, seating 719; then a passage way (on a level with the last upper stop of elevators from the lobby floor of the building) and then the upper balcony, rows M to Z inclusive, seating 854. The length of a line drawn from the stage to row Z, the extreme high row in the upper balcony, would be about 150 feet. The acoustics are excellent and speakers on the stage may be heard in the upper balcony. Loud speakers are used. The very large stage may be seen clearly from all parts of the house, the scenes or people on the stage may not be distinguished so satisfactorily from the upper parts of the house, and one sees better downstairs than up. One of plaintiff's witnesses said persons over fifty, or very heavy, or with certain troubles (heart, kidney, vision), might have difficulty in ascending to and using the high parts of the house. There are four assembly halls, with stages, two on either side of the large hall, which will each seat 698. Two of these may be used for dances. There is a great space called the exposition floor beneath the entire building, and the interior is now being finished of a convention hall, in the south end of the building, that will ordinarily seat 8500, and seats may be added to accommodate in all between 12,000 and 13,000. The large hall rents for $375.00, the Assembly halls for $75.00 and $50.00. There are lounge rooms, etc., adjoining the large hall and each of the assembly halls. Mr. Golterman, Jr., testified there had been no complaints from colored people during the fall season of opera. The colored people were fully represented on the large Citizens' Committee that arranged the various civic celebrations, lasting some days, at the opening of the Auditorium Center in the spring of 1934, and more freely admitted to all the civic entertainments. They had their own night of entertainment in the Auditorium (where the grand opera was later presented), and Miss Franklin, a colored teacher of dancing, used it for a dance recital of her school of dancing. Miss Franklin, who is a director of dancing for the City during summer months, said she distributed blocks of tickets to admit colored people to the three Play Ground Festivals given by the City in the Auditorium in April and September last year. Colored people have also freely rented the assembly halls for their own use. Sometimes fraternities have used the halls admitting only their own members. Practically all the use made, since the opening of the building in the spring

of 1934, of the large auditorium, and the assembly halls and exposition floor, has been made by licensees, paying the City therefor. In all the entertainments given under the direct auspices of the City there has been no discrimination, and there was no evidence that licensees, other than Mr. Golterman who only presented Grand Opera, in any way discriminated against colored people, and no complaints were made by them as to any discrimination save in the Grand Opera seasons. Mr. Hay, the City Counselor, and a member therefor of the Commission, testified it did not intend to discriminate against colored people, but, while wanting to be absolutely fair to them, the Commission did believe the licensee should have the right to control the question of who should be permitted to attend the entertainments, for which the license was granted. That licensees might limit the attendance to the people of a special race or color or creed if they saw fit to do so. There was no evidence to sustain the allegation that there was a plot entered into by defendants among themselves, or with licensees, Golterman or any other, to refuse to sell tickets of admission to the large auditorium to negroes because they were negroes. One witness for the plaintiff stated there were between 93,000 and 95,000 colored people in this city, as per the 1930 census, many of whom were taxpayers. The part hereof descriptive of the building is taken from the evidence given in court May 20, after a visit to the building, made May 6, by the court accompanied by counsel for plaintiff and defendants—and plaintiff personally. The above resumé not only sets forth the salient points necessary for consideration of the legal questions presented by counsel, but is a finding of facts that meet a request made by counsel for plaintiff when the case was finally submitted May 20th.

"The petition might be dismissed because of failure to prove the specific charges made as the basis of complaint, namely, that the building was operated in an illegal manner in that the defendants discriminated against negroes, and denied them admission to public performances, and hence the use of revenue from the building was illegal, and that defendants had concocted a plot in renting the large auditorium to individuals who connived with defendants, and were permitted, encouraged and allowed to refuse to sell tickets to negroes for admission to public performances solely because they were negroes. However, the case took a wide range, and the Court will pass on the question of the legal right of the city, through its Commission in charge of the Auditorium building, to license the use of parties thereof, leaving to the licensees' discretion as to 'the admission of persons of various races, and that it was within the province of the lessee to say who should be admitted and under what conditions.' Plaintiff contends that this policy of discrimination by the City which the City could not make and must prevent its licensees from making—conceding that the City could not make it the proof

is that when the City is the host at entertainments in the building it does not make such discrimination, nor does it refuse to let any part of the building to negroes upon the same terms as a letting to whites. The legality of the bond issue was thoroughly considered by our Supreme Court in the Halbruegger case, 302 Mo. 573, in an opinion, *in banc,* written by Judge J. T. BLAIR. The decision turned on the question whether money voted was to be used for a public purpose so that it came within the provisions of our Constitution section 3 of article 10 that: 'Taxes may be levied and collected for public purposes only.' The substance of the decision is that the 'public purposes' to be served, of providing a building for public meetings, conventions, and gatherings of various kinds, for educational, moral, musical, industrial, labor and other purposes, justified the expenditure of public money. The opinion was a learned and exhaustive review of what were municipal rights, and decisions relating thereto, in the way of spending revenue for the general welfare and happiness of the people, and whatever would 'advance the cause of education and morals among the people of a community and aid in contributing to the general welfare, the progressive influences of moral and cultural forces essential to the advancement of the race.' That the Auditorium building would not be used for meetings, exhibitions and entertainments, educational, musical and otherwise, held only under the direct auspices of the City, may well be inferred from the broad language of the proposition voted on, and this was recognized by the legislative branch of the City government when it passed the ordinance (No. 40145), under which the Commission was provided for and giving it the right, in connection with its general control of the building, to fix a schedule of charges for its use. The building is very large, and the accommodations for public gatherings range from small halls where seven hundred may gather, to the great convention hall that, on special occasion, may seat thirteen thousand people. Manifestly every step taken was with a view to a structure that could be used by the City in whole or in part as needed, at any time for purely civic matters, and when not so needed, and that must be for the greater part of the time, rented, as to its various parts, to persons who would pay for the parts used just as one might rent any place for purposes of public entertainment. In such event the City becomes, for the time, the landlord and the person renting, its tenant. The Charter gives the right to the City to lease; Ordinance No. 40145 carries out that right with respect to this building. It is the law generally that a City when it owns property that, for a time, cannot be used for a strictly public purpose may rent it for private uses. The general rule has been specifically recognized and applied in this State in the Heger-Tower Grove Park case in 323 Mo. 1031, and the principle sustained in the much earlier case of Attorney-General against

Schweickhardt, 109 Mo. 496, which related to the operating of a restaurant in Forest Park under a contract with the owner made by the City under a City Ordinance. The City in matters of that kind does not act in its governmental or political capacity but in a *quasi*-private capacity.

"Counsel for plaintiff in their oral arguments, supplemented by able briefs, have emphasized their thought that what has happened here is a violation of the Fourteenth Amendment to the Constitution of the United States, and they have analyzed that amendment with clearness and precision, citing many cases construing it in varying circumstances. The Court does not think that question is present in this case. The City has not segregated colored people from white people. It has not discriminated in any way against the former. It has not shut its doors to them, or said they cannot make use of this or that part of the building, or sit in this or that section of any part thereof. It has rented, and undoubtedly will continue to rent, any part thereof they wish to use to the colored people as to the white people—and either, when a renter, may say to the other—if you want to come in you will be assigned to certain parts only and to none other. That this may be irritating and vexing, and may run counter to a natural pride is true, but if the City may rent a hall as any landlord might do, and it is within the legal rights of the lessee to do what he may do with the place he has rented for the night, or the week, then those admitted only on his terms cannot say they have been legally hurt.—They have no ground for legal complaint because of his action.—This was recognized as true by our Supreme Court in the Judah case, in 111 Mo., where a theatre owner in Kansas City was held to have the right to let colored persons occupy only balcony seats especially set apart for their use. Judge BLACK said:

" 'Colored persons have their own schools, their own churches, and often their own places of amusement. Whites attending places of amusement designed specially for colored persons may be required to occupy separate seats. When colored persons attend theatres and other places of amusement, conducted and carried on by white persons, custom assigns to them separate seats. Such separation does not necessarily assert or imply inferiority on the part of one or the other. It does no more than work out natural laws and race peculiarities. It ordinarily contributes to the convenience and comfort of both. The colored man has and is entitled to have all rights of a citizen, but it cannot be said equality of rights means identity in all respects. Here the defendants did not exclude or attempt to exclude colored persons from his theatre. He provided accommodations for them, but in doing so required them to purchase tickets for and take seats in the balcony, and this rule adopted by him accords with the custom and usage prevailing in this State. Such

custom has the force and effect of law until some competent legislative power shall establish some other and different rule. The defendant's rule was no more than a reasonable regulation which he had a right to make and enforce.'

"That case is the law of this State today, and if the Court is right in holding that the City can let the different parts of the Auditorium building, when not needed for its own use, as any property owner might let halls he owned, then it may allow the lessee, or licensee, to regulate the admission and seating of those who buy tickets, and the Commission's resolution to that effect is lawful.

"It follows that the plaintiff's petition must be dismissed, and judgment entered for defendants and it is so ordered.

"O'Neill Ryan, Judge."

It follows that the judgment of the circuit court should be affirmed and it is so ordered. *Becker* and *McCullen, JJ.*, concur.