## LAWRENCE v. HANCOCK et al.
### Civ. A. No. 795.

District Court, S. D. West Virginia.
Feb. 11, 1948.

T. G. Nutter, of Charleston, W. Va., for plaintiff.

Mahan, White, Higgins & Laird, of Fayetteville, W.Va. (J. H. White, of Fayetteville, W. Va., of counsel), for defendants.

MOORE, District Judge.

The question presented by this action for a declaratory judgment and for an injunction is:

Can a municipality, by leasing a swimming pool constructed with public funds to a private association of persons, relieve itself of the constitutional obligation to afford colored citizens equal rights with those of white citizens in the use of the public recreational facilities thereby provided?

In the year 1940 the City of Montgomery, West Virginia, submitted to the voters of the City the question of issuing general revenue bonds in the amount of $15,000 for the purpose of constructing a public swimming pool. The bond issue was approved by the voters on June 28, 1940. The proceeds, together with other funds supplied by the Federal Government, were used for the intended purpose, but were exhausted before the project was completed. Late in the year 1942 the City floated an additional issue of so-called "self-liquidating" bonds (that is, bonds which were a lien only on revenues derived from the operation of the swimming pool, and were not otherwise obligations of the City). These self-liquidating bonds produced $19,800. With these additional funds the swimming pool and its appurtenances were completed and ready for operation, with the exception of a fence, in August, 1945. Because of the short time remaining in which the pool could have been used during the season of 1945, together with the lack of a fence, it was not opened to the public in that year.

Shortly before the bond election of June 28, 1940, a group of colored persons representing various Negro organizations appeared before the City Council to make inquiries concerning the policy which would be pursued with reference to use of the pool by Negroes. No assurance was given that Negroes would be allowed to use the pool. On the contrary, a statement was made by the City Attorney in the presence of the group of colored citizens to the effect that he would resign rather than advise the City to permit such use.

Afterwards, and before the pool was opened, other efforts were made by members of the Negro race to secure an official declaration of policy. The testimony is not entirely clear as to how many times delegations of Negroes waited on the Council for this purpose; but there was one conference with Mayor Skaggs, who held office from February, 1942, to February, 1946; and at least one other visit of a Negro delegation to a meeting of the City Council, probably in the early part of 1946. At no time did they get an answer to their question. When completion of the swimming pool was delayed for several years, public opinion, as generally expressed by members of both the white and colored races, was that the delay was due to hesitancy on the part of city officials to take a stand either for or against its use by Negroes.

In February, 1946, the present city administration took office. On May 27, 1946, pursuant to a resolution passed by the Council, the swimming pool property was leased for a term ending September 15, 1946, to the Montgomery Park Association. This was a private corporation, evidently formed for the purpose of taking over the operation of the swimming pool, since its charter was dated May 25, 1946. The terms of the lease, which expresses only a nominal consideration of One Dollar, are as follows:

"1. All net revenue derived by the lessee from the operation of the property and its appurtenances shall be used for the improvement and development of the property and its appurtenances, and providing additional recreational facilities.

"2. The lessee shall keep the property in good repair and pay all utilities and other proper charges against said property.

"3. The lessee shall provide all employees necessary for the efficient and proper management of the property.

"4. The lessor may, at all reasonable hours, through its agents and employees, inspect said property, but the lessor shall not have any duty to make such inspection.

"5. The lessee covenants and agrees to use the best known methods and means for the operation of like properties in order to provide safe, wholesome and efficient management of the pool, and to provide wholesome recreational facilities.

"6. The lessee covenants and agrees that if said property, or any portion thereof, during the term of this lease, shall be damaged by the act, default or negligence of the lessee, or of the lessee's agent, employee or employees, patrons, guests, or any persons admitted to said premises by said lessee, the said lessee will promptly restore said premises to their present condition. The lessee hereby assumes full responsibility for the character, acts and conduct of all persons admitted to said premises, or to any portion of said premises by the consent of the said lessee, or by or with the consent of said lessee's employees or any person acting for and on behalf of said lessee.

"7. The lessor assumes no responsibility whatever for any property placed on or in said property, and the said lessor is hereby expressly released and discharged from any and all liability for any loss, injury or damage to persons or property that may be sustained by reason of the occupancy of said property under this lease.

"8. The lessee shall not assign this lease, nor suffer any use of said premises other than herein specified, nor sublet the premises or part thereof, without the written consent of the lessor.

"9. The lessee shall not use said premises for any purpose or purposes than that of providing recreational and cultural facilities, in accordance with the charter granted to the lessee by the State of West Virginia on May 25, 1946.

"10. The lessee shall have the complete and full control of said property during the term hereof and shall establish and enforce proper rules and regulations governing the operation and management of said property and its appurtenances."

In the summer of 1946 the plaintiff in this suit, who has been a citizen of Montgomery for thirty-six years, together with four other Negroes, applied at the main office of the swimming pool for season tickets, tendering in cash the amount which was posted over the door as the proper fee for season tickets. They were refused permission to buy tickets, and this action was later confirmed by the manager of the Montgomery Park Association on the ground that "he didn't have any orders to sell tickets to colored people." On appealing to the president of the Park Association, defendant F. B. Eberhart, they got the same answer: "they hadn't made arrangements to sell colored people tickets."

Since the lease contained no renewal provisions, it expired by its terms on September 15, 1946; but again on February 1, 1947, a new lease was made on exactly the same terms, expiring on September 30, 1947. Since the expiration date of this second lease, the Montgomery Park Association has had no interest in the swimming pool.

In the early part of the summer of 1947, Dr. Robert A. Meade, one of the Negroes who had been with the plaintiff when they tried to obtain tickets to the swimming pool in the summer of 1946, called the present Mayor, defendant R. M. Holstine, by telephone and "asked him if we (Negroes) would be able to use the pool this year." The Mayor's reply was: "That won't do for you to use the pool."

The plaintiff again, in the summer of 1947, applied at the ticket office for admission to the swimming pool and was again refused permission to use it.

On September 10, 1947, this action was begun, praying for a declaration of plaintiff's rights to use of the swimming pool and for an injunction against the defendants to restrain them from discriminating against him because of his race.

The Thirteenth, Fourteenth and Fifteenth Amendments to the Constitution of the United States, all of which were ratified and proclaimed soon after the end of the Civil War, are, in a peculiar sense, the Negro's birthright of American citizenship. Lincoln's Emancipation Proclamation, purely a war measure, freed the Negro from slavery; but not until the constitutional changes were made was his status as a free man with all the rights of citizenship incontrovertibly established.

Customs and prejudices which grew up through many years of Negro slavery have not been easily eradicated. Deep-seated feelings and aversions cannot be readily changed by the passage of a law, even though it be a constitutional amendment. It is not to be wondered at, therefore, that the Negro has continued to be the object of racial antagonism, intolerance and discrimination on the part of many of his white brethren whose grandfathers were the masters while his was merely the slave. It is not within the province of the Court to attempt to regulate the feelings, the attitude, or even the conduct of individuals of the white race towards persons of another race, so long as such conduct involves no illegal act; and purely private acts of racial discrimination are not as such illegal. However desirable it may be that mutual respect and amity be maintained and fostered between two different races occupying the same country as citizens, this is an end to be achieved, if at all, by other means than an action in Court.

When, however, governmental rather than individual discrimination is charged, it becomes the duty of the Court to examine the facts, and, if the facts support the charge, to prevent the discrimination.

The complaint alleges and the answer admits that the swimming pool was authorized and established pursuant to Article 14 of Chapter 8, Michie's Code of West Virginia. This statute prescribes the procedure which is to be followed by municipalities which may elect to avail themselves of its provisions in "establishing, improving, developing, operating and maintaining a municpal public park system" (including swimming pools). The first step is the creation by the City of a Board of Park Commissioners. This Board is given exclusive control and management of the construction, operation and maintenance of all property used in the public park system. It may take title from the City to land for park purposes, and having done so, it can sell and convey no part thereof except such as "it may determine to be of no advantage in the operation, management and maintenance of said public parks * * * swimming pools * * * and other like public recreational facilities." The City is authorized to issue bonds for park projects, with the approval of the voters at a bond election, and in form prescribed by the Board. The ordinance to be passed by the City submitting the question of issuing bonds to a vote of the people is required to contain a statement of the purpose for which the debt is to be created, which statement is to be deemed sufficient if it specifies "that the same is for the purpose of establishing * * * and operating a public park system for the municipality, without specifying the particular improvements * * *." By general law, four weeks notice is required for calling the election, and the proceeds must be applied according to the terms of the ordinance submitted to the voters. W.Va. Code (Michie, 1943), Ch. 13, Art. 1, §§ 8, 22.

Obviously, from the pleadings and evidence in this case, the City did not comply with the statute in establishing the swimming pool. No Board of Park Commissioners was created. Therefore, none of the provisions relating to action of such a Board in connection with the issuance of bonds and subsequent management of the swimming pool were followed. It is quite possible that the validity of the first bond issue might have been questioned. However, the fact that there were irregularities in the proceedings can have no bearing on the questions arising in this case.

It was the clear intent of the Legislature, in conferring power on municipalities

to establish parks, that such parks as might be established pursuant to the statute would be for the use of the general public, and not merely for one or more racial groups.

■ The general rule as to parks, playgrounds and swimming pools places their operation in the category of governmental activity by the municipality. 39 Am. Jur., Parks, Squares, and Playgrounds, § 7. However, at least with respect to tort liability for acts of municipal employees, West Virginia follows the minority line of decisions, holding that the operation of parks and swimming pools is a proprietary activity. Ashworth v. City of Clarksburg, 118 W.Va. 476, 190 S.E. 763. Since it is generally held that a municipality may lease property which it holds in its proprietary capacity, it may be plausibly argued that under the law of West Virginia the City of Montgomery had the power to lease the swimming pool to the Montgomery Park Association; but the primary question of plaintiff's constitutional right to equality of opportunity to use the pool remains, even though its operation is carried on by the lessee. The power to lease does not include the power to discriminate against members of a minority race in the exercise of their constitutional rights; nor can the City by such a lease as we have here relieve itself from its constitutional obligation to afford to all its citizens equal rights in the use of the public swimming pool which is the subject of the lease. The provisions of the statute are clear that the Board of Park Commissioners to be appointed shall operate the pool in a manner most conducive to the well being of the general public. Since no such Board was established, it was incumbent on the City itself to operate or cause the pool to be operated in the same manner in which the legislature intended the Park Commissioners to operate it.

No private person or group of persons had anything whatever to do with the management of the Montgomery swimming pool as a construction project. After it was finished, and before it was opened to the public, as we have seen, the seasonal lease was made to the Montgomery Park Association. The lease provided for no consideration to be paid to the City. The lessee was not permitted to make any profit from the operation of the pool, but was required to use all net revenue to improve and develope it, and to provide additional recreational facilities. The lessee was required to operate the pool so as to provide safe, wholesome and efficient recreational facilities; and it was prohibited from using the premises for any other purpose.

■ From these facts it is clear that the Montgomery Park Association was a mere agent or instrumentality through which the City of Montgomery operated the swimming pool, at least to the extent that the rights of its citizens to use of the pool are affected. Cf. Kerr et al. v. Enoch Pratt Free Library of Baltimore City et al., 4 Cir., 1945, 149 F.2d 212. Boiled down to its essence, the City by this lease simply said to the Association: "Take this swimming pool. Operate it properly during one season. Pay us no rental. Use all profits for improvements and expansions. Return it to us in good condition at the end of the season. Establish your own rules (including rules as to what races are to be permitted to use the pool)."

Justice would be blind indeed if she failed to detect the real purpose in this effort of the City of Montgomery to clothe a public function with the mantle of private responsibility. "The voice is Jacob's voice," even though "the hands are the hands of Esau." It is clearly but another in the long series of stratagems which governing bodies of many white communities have employed in attempting to deprive the Negro of his constitutional birthright; the equal protection of the laws. See Smith v. Allwright, Election Judge, et al., 1944, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987, 151 A.L.R. 1110; Nixon v. Condon et al., 1932, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984, 88 A.L.R. 458; Clay Rice et al. v. George Elmore, 4 Cir., 1947, 165 F.2d 387; Kern v. City of Newton, 151 Kan. 565, 100 P.2d 709, 129 A.L.R. 1156.

This conclusion is not disturbed by the fact that after the funds from the general bond issue were exhausted the City raised additional funds by a self-liquidating bond issue, under the provisions of Chapter 8, Art. 4A, Rev.Code Michie 1943. This Article empowers the City to issue self-liquidating bonds and to use the proceeds

for the construction of public works (including swimming pools). The revenue from the project is the only revenue of the City that may be used to pay the interest on and retire the bonds issued pursuant to this Article. After giving the City authority to issue these bonds the Article provides that construction and operation of the project shall be under the supervision and control of the municipality or a commission appointed by the municipal authorities.

It is further provided that after the completion of such work the board shall operate, manage and control the same, and do all things necessary for the successful operation thereof. Two weeks publication and ten days notice before a public hearing which must be had, and details as to rate of interest and time within which bonds must mature are specified. Proceeds from the sale of bonds must be applied to the cost of the project or its sinking fund. The bonds are a lien on revenue of the project and in no way obligate the City. A sinking fund must be provided, and enough net revenue is required to go into this sinking fund to provide for interest, fiscal charges, retirement of bonds and a margin of safety. The City has the duty to charge rates high enough to pay the bonds, and a hearing on these rates, with appeal to the public service commission of the State, must be held. An amendment, Code, § 8-4A-21, adopted at a session of the Legislature held subsequently to the passage of the original Act, provides that the City may, by ordinance, lease the project; but if leased the City must receive enough revenue from the lessee to maintain the sinking fund. A statutory lien on the revenue in favor of the bondholders is provided, and in default a receiver may be appointed.

■ The City may have relied upon this amendment for authority to lease the pool. However, as I have said, if it be held to have such authority, it could not by such a lease relieve itself of the obligation to see that the constitutional right of all its citizens to equal protection of the law in the use of the pool was preserved. Such a lease must be held to be subordinate to this right,

and to contain an implied provision protecting it.

■ The question posed by the facts in this case is one of constitutional character. Obviously an act of the legislature cannot lighten the burden imposed on municipal governments by the Fourteenth Amendment to the Federal Constitution.

There are many projects that might be leased which would present no problem as to discrimination between the white and colored races. It happens that this particular project does present such a problem. It would scarcely be argued that a city could establish water works, sewerage systems, flood walls, roads and other public works included with parks and swimming pools in Chapter 8, Art. 4A of Michie's West Virginia Code, and then lease them to private operators, who would be allowed to discriminate as to which races could use such projects.

■ It is not conceivable that a city can provide the ways and means for a private individual or corporation to discriminate against its own citizens. Having set up the swimming pool by authority of the Legislature, the City, if the pool is operated, must operate it itself, or, if leased, must see that it is operated without any such discrimination.

Counsel for defendant rely on Harris v. City of St. Louis, 233 Mo.App. 911, 111 S.W.2d 995, for the proposition that a city may lease public facilities discriminatively to private operators. However, the facts of the Harris case are materially different from the facts in the instant case. While it is authority for the principle that lessees of a city auditorium may adopt their own rules as to admittance thereto, the Court in that case notes that during operation by the City itself, or in allowing various groups to lease the auditorium, there was no discrimination. Had the City of Montgomery leased the pool for private operation and for a short period of time, say for a picnic or convention of some particular group or association, and had it allowed any Negro organization to lease the pool under the same terms, and had the City operated the pool on a nondiscriminatory basis at all other times, then a similar situation would

be presented as in the Harris case; but such are not the facts of this case.

■ The contention of the City that there is no pending controversy upon which to base a suit for a declaratory judgment is without merit. Plaintiff tried on two occasions in successive seasons to obtain admission to the pool, and each time was denied that right solely because of his race. He could hardly have done more in the attempt to enforce his constitutional right. But, it is said, the season is now ended and the lease has expired; there is no indication that the City will again lease the pool, or that plaintiff will again be denied admission. In view of my conclusion that the refusal to admit him to the pool was governmental and not private action, there is no basis for this argument. The pool still exists, although temporarily closed. If it is opened to the public again, the plaintiff will be entitled to the rights he asserts. He has twice been denied these rights. It is the duty of this Court on his complaint and the evidence in its support to declare what his rights are. Morris (Hibbler, Intervener) v. Williams et al., 8 Cir., 1945, 149 F.2d 703.

One of the defenses set up by the City is that it had no funds in 1946 to complete the pool and make it ready for operation; and this is given as the reason for the lease to a private association. This reason, however, even if it were valid in 1946, could not have continued so in 1947, for at that time the pool had been fully completed and had been operated for one season. Yet the City again leased it to the same Association for the 1947 season.

■ An order may be entered in the form of a declaratory judgment to the effect that refusal by the Montgomery Park Association to admit plaintiff to the swimming pool was an exercise of governmental power by the City of Montgomery and as such was in violation of plaintiff's rights under the Constitution of the United States. The order may further include an injunction against the City of Montgomery, its Council and Mayor, restraining them from again denying plaintiff the right to use the swimming pool at any time when the pool is open for public use, unless there be pro-

vided by the City other and equal swimming pool facilities available to persons of the Negro race.

The Montgomery Park Association having had no interest in the controversy since the expiration of the second lease on September 30, 1947, the complaint will be dismissed as to the Association and its officers.