Welker C. MITCHELL, an infant, by Margaret U. Mitchell, Mother and next friend, individually and on behalf of others similarly situated, Plaintiff,

v.

BOYS CLUB OF METROPOLITAN POLICE, D. C., a corporation, Robert E. McLaughlin, Member, Board of Commissioners, District of Columbia,

and

Alvin C. Welling, Member, Board of Commissioners, District of Columbia, Defendants.

Civ. A. No. 4035–55.

United States District Court District of Columbia.

Nov. 27, 1957.

Thurman L. Dodson, E. Lewis Ferrell, Horace O. Pollard, and Herbert O. Reid, Washington, D. C., for plaintiff.

John J. Wilson, Raymond F. Garrity and Francis J. Ferguson, Washington, D. C., for defendant, Boys Club of Metropolitan Police, D. C., a corporation.

John A. Earnest, Asst. Corp. Counsel for the District of Columbia, Washington, D. C., for defendants Robert E. Mclaughlin and Alvin C. Welling, members of the Bd. of Com'rs of the District of Columbia.

Chester H. Gray, Corp. Counsel, Milton D. Korman, Principal Asst. Corp. Counsel, and George C. Updegraff, Washington, D. C., and William F. Patten, Asst. Corp. Counsel, Washington, D. C., also entered appearances for said defendants.

MATTHEWS, District Judge.

Welker C. Mitchell, a colored youth, by his mother, Margaret U. Mitchell, brought this suit for himself and on behalf of others similarly situated. The defendants are the Boys Club of Metropolitan Police, D. C., a corporation, and Robert E. McLaughlin and Alvin C. Welling who are sued in their official capacity as members of the Board of Commissioners of the District of Columbia. David B. Karrick, the remaining member of the three member Board of Commissioners of said District, is not a party to this suit, his substitution for his predecessor in office not havng been made as provided by Rule 25(d) of the Federal Rules of Civil Procedure, 28 U.S.C.A.

The plaintiff seeks to have the Court (1) declare the club corporation an agency of the District of Columbia Government, (2) enjoin the club corporation from denying membership in any of its clubs to plaintiff and other boys solely because of their color, (3) compel the acceptance of plaintiff's application for admission to Club Number Five now maintained for white boys, and (4) in the alternative (if plaintiff is not entitled to the above relief), enjoin the said Board of Commissioners from contributing to the club corporation any of the property, facilities, personnel or services of the District of Columbia so long as the club corporation operates racially segregated clubs.

It is conceded that the plaintiff was denied admission to Club Number Five solely because of his color pursuant to the uniform policy of the club corporation to maintain racially segregated clubs. Upon his premise that the club corporation is an agency of the District of Columbia Government the plaintiff contends that the denial of his admission constitutes an arbitrary deprivation of his liberty by the municipality itself in violation of the Fifth Amendment to the Constitution. The defendants deny that the club corporation is an agency of the District of Columbia Government. They deny that any constitutional right secured to the plaintiff is being infringed. Their position is that the club corporation is a private charitable organization, and therefore that its practice of racial segregation in its clubs is *private* action which is not forbidden by the Fifth Amendment.

The question presented here is whether the club corporation is an agency of the District of Columbia Government. In other words, the issue is whether the racial segregation about which plaintiff complains is public action or private action. If it is public action, then it violates the Fifth Amendment. Bolling v. Sharpe, 347 U.S. 497, 74 S. Ct. 693, 98 L.Ed. 884. On the other hand, if it is private action it is lawful and does not offend the guarantees of the Fifth Amendment. National Federation of Railway Workers v. National Mediation Board, 71 App.D.C. 266, 110 F.2d 529, certiorari denied 310 U.S. 628, 60 S.Ct. 975, 84 L.Ed. 1399.

The nature of corporations is discussed in the landmark case of Trustees of Dartmouth College v. Woodward, 4 Wheat.

.518, 669, 671, 17 U.S. 518, 669, 671, 4 L.Ed. 629, in part as follows:

"Public corporations are generally esteemed such as exist for public * * * purposes only, such as towns, cities, parishes and counties; * * * strictly speaking, public corporations are such only as are founded by the government, for public purposes, where the whole interests belong also to the government. If, therefore, the foundation be private, though under charter of the government, the corporation is private, however extensive the uses may be to which it is devoted * * *

* * * * * *

"When the corporation is said, at the bar, to be public, it is not merely meant that the whole community may be the proper objects of the bounty, but that the government have the sole right, as trustees of the public interests, to regulate, control and direct the corporation, and its funds and franchises, at its own good will and pleasure. Now, such an authority does not exist in the government, except where the corporation is in the strictest sense, public; that is, where its whole interests and franchises are the exclusive property and domain of the government itself."

It is undisputed that the club corporation was organized as a private institution. No claim is made that it has consented to being turned into a public corporation or that Congress has passed legislation purporting to accomplish such a transformation. What the plaintiff argues is that the corporation's operations and finances have become so dependent upon and "involved and emmeshed" with the District of Columbia that it now constitutes a de facto arm or agency of the municipal government. He grounds this theory on the fact that police officers aid the club corporation in its activities and participate in its fundraising campaigns and that it is permitted free use of certain property and facilities belonging to the District of Columbia.

An evaluation of the claim of the plaintiff depends upon the surrounding circumstances. Therefore the circumstances in this case will now be reviewed.

When the plaintiff was ten years old he applied for and was admitted to membership in a club operated by the club corporation for colored boys at 1200 U Street, N. W. Deciding after about six months that he no longer wanted to be a member he ceased to be one. Five years later while still living in Northwest Washington he presented himself, with an executed application of membership, to Club Number Five in Southeast Washington which is located in an abandoned fire house owned by the District of Columbia. Membership in that club for white boys being refused, plaintiff filed this action.

The club corporation was organized in 1934 under the laws for the District of Columbia as a private charitable organization, the incorporators being three civilians and one police official who is called the Founder.

The aims of the club corporation are to develop correct speech, beneficial sports and clean habits among the boys of Washington, to cooperate with all recognized agencies in their work for the development of good citizenship in Washington, to teach boys the fundamentals of law observances, by a proper direction of recreational activities to lessen juvenile delinquency, and to create an interest among the citizens of Washington in their responsibilities to youth.

A boy may become a member of a club without cost to him or his parents in the way of fees, dues or assessments, all expenses being borne by the club corporation.

In the twenty-three years the club corporation has existed its clubs have ranged in size from one club with 200 boys to nine clubs with a membership of approximately 22,000 of which over 13,-000 are colored boys while the balance of over 8,000 are white boys. The progams

within each club are divided into five parts: social, athletic, crafts, recreational and educational. In addition to its clubs the club corporation maintains two summer camps in Maryland on properties in its ownership.

The management and control of all affairs of the club corporation are in a Board of Directors comprised of 179 men who are public spirited citizens of the District of Columbia. Over two-thirds are private citizens while the remainder are active or retired police officers. Two of the 179 members of the Board of Directors need not be elected, these being respectively, the Founder and the Chief of Police. The remaining 177 directors are divided into three groups of 59 each, the term of each group being three years, and members thereof fill vacancies by electing new members at the annual meeting.

The principal officers of the club corporation are President, First Vice-President, Second Vice-President, Comptroller, Treasurer, Assistant Treasurer, Secretary, Assistant Secretary and General Counsel. All are civilians, none being police officers. Exercising the administrative duties of the Board of Directors during the intervals between its meetings is an Executive Committee consisting of the above listed officers, the Chairman of Standing Committees, Past Presidents who are members of said Board, the Founder and the Chief of Police and their predecessors in office who are members of said Board. The Executive Committee is not empowered to make major changes or decisions as to policy or to authorize any major expenditures. The civilian members of the Executive Committee are greatly in excess of a majority.

Besides the above described officers the bylaws mention the following: Executive Secretary, Director, Office Manager and Supervisor of Clubs. These posts are all filled by civilians paid by the club corporation except that of Director which is held by a Police Captain, hereafter called the Captain. Unlike the officers of the club corporation, the holders of the above posts are not designated under the bylaws as members of the Executive Committee but they may be elected to the Board of Directors by that Board in which event they have no right to vote or hold office. However, no such election has been shown. So holding the post of Director is not the same as being a Director on the Board.

Subject to the approval of the Board of Directors the civilian Executive Secretary formulates all club programs and activities, and sets the budget for each club. He is in charge of the hiring and discharge of personnel. He is responsible to and carries out the orders of the Board of Directors and all employees are subject to his direction.

The Captain is Chief of the Boys' Activity Bureau of the Youth Aid Division of the Metropolitan Police Department and he has been assigned by his superiors to duties with the club corporation. Insofar as matters of the club corporation are concerned he serves under its civilian Executive Secretary. He coordinates the clubs and deals with routine administrative details pertaining to their operation, each club being under a civilian supervisor who directs daily club activities. The Captain also makes recommendations to the Executive Secretary and the Board of Directors.

In all the club corporation has over 200 employees. Some are employed only during the summer camp season while more than 100 are full time employees.

No governmental funds are received by the club corporation. Its income has been and still is entirely from dues, contributions, legacies, gifts, rents, dividends, and interest. The net worth of the club corporation at the end of 1956 was $812,000 and during the period 1935 through 1956 the club corporation spent $3,459,500 of its income on its program. The obligations of the club corporation are paid from funds owned solely by the corporation and under the control of its civilian officers.

Two of the nine clubs here involved are at locations having no club houses

and hence there are in all seven "club houses" exclusive of the summer camps. Three club houses are owned outright by the club corporation, one is rented by it from private individuals, and three are operated in properties owned by the District of Columbia. These three properties consist of two abandoned buildings— a school house and a fire house—and a two-room sub-basement of a police station. Water, heat and light are furnished by the District of Columbia for the sub-basement but the club corporation pays for repairs, light, heat, electricity and every other maintenance expense for the school house and fire house. The club corporation pays no rent as such but for improving these properties has expended over $75,000. The club corporation also uses two rooms in the District of Columbia Municipal Center as an administrative office, and at that location heat, light and local telephone service are furnished by the District of Columbia, but most of the furnishings and equipment in said office belongs to the club corporation, and it furnishes supplies.

In the area in the District of Columbia Municipal Center used as the administrative office of the club corporation the Executive Secretary and the Director (the Captain) have offices. The Executive Secretary is employed on a part time basis and is not at the administrative office daily but is there at intervals and is constantly available by telephone to give advice and directions. Besides the Executive Secretary and the Director (the Captain) five employees of the club coporation are regularly stationed at the administrative office—an office manager, three clerical workers and a driver.

In addition to the Captain nine uniformed policemen are assigned to special duty with the clubs. The clubs are grouped into two divisions, and one club may play another in an athletic contest within a division. Two policemen act as club coordinators under the Captain, one for each of the two divisions. The other seven policemen are assigned to the individual club houses. These policemen are subject to performance of regular duties as well as to call for such other special detail as may be deemed necessary by their immediate police superiors. Their most important function at the club houses is for their presence there to develop mutual confidence and respect between the boys and representatives of the police force. The salaries of the Captain and policemen who have assignments to special duty with the clubs amount to about $50,000 yearly.

Each year the club corporation carries on a membership campaign under the direct supervision of its campaign chairman who is a civilian member of the Board of Directors. Solicitation for memberships is made by certain policemen who are assigned to such duty by their individual precinct Captain. The policemen who participate in the membership campaigns are in full uniform and in view of the public the majority of the time. Their presence in uniform fulfills one of the major responsibilities of a modern Police Department, "Prevention of Crime". The solicitation by the policemen is in their respective precincts and thus they are afforded an opportunity to become better acquainted with the citizens living in such precincts. They submit their collections to the campaign chairman and the treasurer and comptroller of the club corporation. While engaged in the membership campaigns the policemen are available for and perform general police duties. Representative of these duties are their functions in connection with fires, major accidents, large parades, Presidential appearances, directing school and rush hour traffic, as well as emergencies such as that created by the 1955 Capital Transit Strike.

The solicitation and fund raising done by policemen is with the consent and permission of the Board of Commissioners of the District of Columbia and is for the benefit of the club corporation and the boys who are its members, and not for the benefit of the police department or any other governmental agency. Memberships are also procured through sources other than police officers. For the years 1954 through 1957 the club

corporation received over $300,000 annually from contributing memberships. Three-fourths or more of these sums were collected from private individuals by uniformed policemen in annual membership drives.

The club corporation has a Women's Auxiliary formed in accordance with its by-laws, and composed of 180 private citizens, not more than five of whom are wives of active or retired police officers. This Auxiliary is a self-contained unit which chooses its own members and elects its own officers and acts in cooperation with the Board of Directors of the club corporation. All matters of policy are subject to the approval of the Board of Directors. Its primary purpose is to raise funds by dues and special activities with which to purchase equipment for use in the clubs, and its average income is approximately $3,000 although on occasion it has raised as much as $6,000 a year.

The above recital gives the setting in which the plaintiff makes his claim that the club corporation is an agency of the District of Columbia Government and hence that its maintenance of racially segregated clubs is discrimination forbidden by the Fifth Amendment. He relies on Kerr v. Enoch Pratt Free Library of Baltimore City, 4 Cir., 149 F.2d 212, certiorari denied 326 U.S. 721, 66 S.Ct. 26, 90 L.Ed. 427, and Lawrence v. Hancock, D.C., 76 F.Supp. 1004. But his reliance is misplaced. The cited cases depended on facts not present in the instant case.

In the Kerr case it was held that a colored woman was denied the equal protection of the law guaranteed by the Fourteenth Amendment in that she was refused admission to a library training class because of her color, the Library being an instrumentality of the state of Maryland and its Board of Trustees representative of the state. The history of the Library revealed that Enoch Pratt, desiring to give the Library to the City of Baltimore, sought the aid of the state to found the Library as a public institution to be owned and supported by the city but to be operated by a self perpetuating board of trustees first named by him to safeguard the Library from political manipulation. This was accomplished by special act of the legislature with the result that the library corporation was "completely owned and supported from its inception by the state" and the powers and obligations of the City of Baltimore and the Library Board of Trustees were conferred not by Mr. Pratt but by the state. [149 F. 2d 215.]

Conversely the evidence in the instant case does not show that the club corporation was ever "owned and supported" by the District of Columbia. The budget of the club corporation is not a part of the municipal budget as was the Library budget in the Kerr case. The 200 or more employees of the club corporation are not as were the Library employees on the municipal payroll. The boys clubs are not financed from any public treasury. The situation was different in the Kerr case, the city furnishing 99 per cent of the total cost of Library operations.

The case of Lawrence v. Hancock, supra [76 F.Supp. 1005], involved a swimming pool constructed with public funds by a city pursuant to legislative authority. The city by leasing the pool sought to "relieve itself of the constitutional obligation to afford colored citizens equal rights with those of white citizens" in the use of the pool. The lease was given to a technically private corporation established for the purpose of operating the pool, the consideration being a dollar yearly. No restrictions were placed by the city on the lessee except that the lessee was to operate the pool safely, efficiently and for recreational purposes. All profits were to be used for improvements. The lessee was to control admissions. From the circumstances and the terms of the lease the court found that the lease was planned by the city hoping to circumvent the Fourteenth Amendment and that the lessee was an instrumentality through which the city operated the pool. The court ruled that

the city, if the pool is operated, must operate it itself, or, if leased, must see that it is operated without discrimination because of race.

Missing from the instant case are the critical facts present in Lawrence v. Hancock. The boys clubs were not set up as was the swimming pool by the city. Neither were the clubs established as was the pool with public funds under a legislative act. Moreover, the club corporation was not set up as a private corporation in a scheme to have the District of Columbia get around the Fifth Amendment.

 It is well settled that aid given by a government to a private corporation is not enough in itself to change the character of the corporation from private to public. Maiatico Const. Co. v. United States, 65 App.D.C. 62, 79 F.2d 418, 421, certiorari denied 296 U.S. 649, 56 S.Ct. 309, 80 L.Ed. 462. This case involved interpretation of a Federal statute requiring a person entering into a contract with the United States for the construction of a "public building" or completion of any "public work" to execute a bond conditioned that the contractor shall promptly make payment to all persons supplying him with labor and materials in the prosecution of the work, and giving to all such persons the right to intervene in a suit upon the bond. In a suit claimed to be on such a bond the question was whether three dormitories built on land owned by Howard University (a private corporation) were "public buildings" or "public works", the United States having borne the cost of the dormitories and entered into the agreement with the contractor for their erection. It became necessary to decide whether Howard University had lost its private character because of an Act of Congress providing for large annual appropriations for construction, maintenance and development of the institution including payment of personnel, and stipulating that the University be open for inspection by the Bureau of Education and that the Bureau report yearly to Congress regarding its inspection.

 In reaching the conclusion that the University had retained its character as a private corporation, that its rights, powers and liabilities were fixed by its charter and the laws in relation to private corporations, and that the dormitories involved were neither public buildings nor public works, the court said in part:

"Congress has passed no law giving the Secretary of the Interior or any other officer of the government control of the University, and we think it is obvious it could not do so without the consent and approval of the corporate authorities of that institution. Hence, in the view we take, the generosity of the government is not enough in itself to change a private into a public institution."

The court cited many cases supporting its ruling and distinguishing public corporations from private corporations, and concluded as follows:

"Numerous other cases to the same effect can be cited and, so far as our examination has gone, there are none to the contrary; and so we reach the conclusion that Howard University is a private institution;

"That its right and title to its buildings is not affected by the fact that many of them may be the result of the generosity of the national government * * *."

It is the view of this court that the upholding of the contention in the instant case that the club corporation has become an agency of government because of aid given it by the District of Columbia as above outlined would not only be contrary to legal precedent but would produce startling results as well. The Board of Commissioners of the District of Columbia has allowed the use of property and facilities belonging to the District to certain private institutions in the pursuit of their civic, benevolent and charitable objects. Among these institutions are several societies for the blind, Alcoholics Anonymous, a nursery school,

and a congress of parents and teachers. In the money raising campaign for the benefit of agencies such as the Boy Scouts, the Red Cross, the Salvation Army, and the Prevention of Blindness Society which is now being conducted by the United Givers Fund of the National Capital Area, Inc., many government employees are being permitted to solicit contributions on official time as policemen have done for the club corporation. If each time a government lends its assistance to a private institution it were to acquire that institution as an arm of government, then government would indeed become a many armed thing. According to the two members of the Board of Commissioners of the District of Columbia who are before the court the Board treats as a matter within its discretion such aid as the District gives to private institutions whose activities promote community interests. In their judgment the time that police officers devote to Boys Club work cannot be considered a deviation from police duties since the moulding of the future of the city's underprivileged boys towards good citizenship constitutes a major phase of police work, and ultimately accomplishes the prevention of juvenile delinquency and crime. However that may be, it is clear that police officers only participate in the affairs of the club corporation. They do not control the corporation. Government control is the decisive factor in the determination of whether a corporation is public or private and governmental control of the club corporation does not exist. The club corporation, a private institution, acting on its own initiative and expressing its own will, may segregate its clubs without thereby offending the guaranties of the constitution. National Federation of Railway Workers v. National Mediation Board, 71 App.D.C. 266, 110 F.2d 529, certiorari denied 310 U.S. 628, 60 S.Ct. 975, 84 L.Ed. 1399.

On the basis of the facts in the present case and established principles of law the court concludes:

(1) That the Boys Club of Metropolitan Police, D. C., is a private charitable corporation, directed, maintained, and operated predominantly by private citizens;

(2) That the use of certain District of Columbia property and facilities by said club corporation and the participation of policemen in its work and in its fund raising campaigns have not changed its private nature or made it an instrument of government for the administration of public duties;

(3) That said club corporation is not a de facto arm or agency of the District of Columbia government;

(4) That the practice of said club corporation of maintaining segregated clubs is private action not forbidden by the Fifth Amendment;

(5) That the court is not empowered to interfere with the segregation practices of a private corporation;

(6) That the court lacks jurisdiction over the statutory three-member Board of Commissioners for the District of Columbia, only two members of the Board being defendants in this action; and

(7) That the complaint should be dismissed as to all defendants.